## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-03357

**THE BAR METHOD FRANCHISOR, LLC,** a Delaware limited liability company,

        Plaintiff,

v.

**HENDERHISER LLC**, a Colorado limited liability company; **BRAVENCE WELLNESS COLLECTIVE LLC**, a Colorado limited liability company, and **LAURA E. HENDERSON**, an individual,

        Defendants.

---

### PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
### AND A PRELIMINARY INJUNCTION

---

Plaintiff The Bar Method Franchisor, LLC ("The Bar Method") submits this Motion for a Temporary Restraining Order and Preliminary Injunction against Defendants Henderhiser LLC ("Henderhiser"), Bravence Wellness Collective LLC ("Bravence") and Laura E. Henderson ("Henderson") (collectively "Defendants") pursuant to Fed. R. Civ. P. 65 and D. Colo. Local Civil Rule 65.1(a).

To comply with all applicable rules, The Bar Method is simultaneously requesting a temporary restraining order and a preliminary injunction. The first request is proper and necessary in light of the immediate and immeasurable harm faced by The Bar Method as a result of Defendants' conduct, discussed in detail below; and because The Bar Method has met and

conferred with Defendants' counsel and Defendants refuse to cease and desist from the unlawful conduct giving rise to this lawsuit and this motion. Fed. R. Civ. P. 65 and D. Colo. Local Civil Rule 65.1 permit the issuance of a temporary restraining order before, and in addition to, a preliminary injunction to last the pendency of the case. If the Court denies The Bar Method's request for a temporary restraining order, The Bar Method requests that this Court consider The Bar Method's simultaneous request for a preliminary injunction, including by holding an expedited hearing as the Court's calendar allows.

## CERTIFICATE OF CONFERRAL – D. COLO. Local Civil Rule 7.1(a).

The undersigned counsel warrants that it conferred with Defendants' counsel, Ed Schroeder, Esq., at Schroeder Law in Littleton, Colorado between December 8 and December 10, 2021 via email. These communications are attached to the Declaration of Susan E. Tegt, Esq. ("Tegt Decl."), attached hereto as Exhibit A. In short, Defendants' have refused to cease the injurious conduct giving rise to this motion notwithstanding The Bar Method's providing Mr. Schroeder with substantial evidentiary support for the motion.

## INTRODUCTION

This case is the second lawsuit between the parties and follows the Defendants' fraudulent inducement of a Settlement Agreement intended to get The Bar Method to cease pursuing injunctive relief to protect its trade secrets, goodwill and franchise system through promises and covenants by the Defendants that they would not unlawfully compete with The Bar Method by offering barre fitness classes or using The Bar Method's confidential information after the end of the parties' six-year franchise relationship. In reliance on these promises, The Bar Method agreed to dismiss its first lawsuit and stop its pursuit of an injunction intended to prevent Defendants'

2

competitive fitness studio, Bravence, from opening its doors and operating a competitive boutique barre fitness studio built from The Bar Method's misappropriated goodwill and proprietary methods of instruction and operation.

Defendants, however, had other plans and this latest lawsuit is the result of Defendants' duping The Bar Method into entering into a Settlement Agreement they never intended to abide by. On the <u>same day</u> Defendants signed the Settlement Agreement agreeing not to provide barre classes at Bravence and agreeing not to use The Bar Method's client and other proprietary information, Bravence opened its doors and offered the exact same barre classes taught by the Bar Method® instructors from the former franchised studio. In further immediate defiance of the parties' settlement, Defendants openly advertised that they were using The Bar Method's proprietary methods of instruction created from twenty years of research and development and that they had diverted The Bar Method's client base in the Denver market to Bravence.

The Bar Method and its counsel have never seen such a blatant disregard of the legal process or intent to deceive which has served to almost destroy The Bar Method's goodwill in the marketplace and dilute The Bar Method® brand. This immeasurable harm compounds each day Bravence continues to operate. The Bar Method therefore seeks by this motion a temporary restraining order and preliminary injunction that rescinds the fraudulently-obtained Settlement Agreement and enforces the restrictive covenants in the Franchise Agreement between The Bar Method and Henderson and Henderhiser (the "Henderson Defendants"), precluding them from operating any fitness business within a five-mile radius of the Henderson Defendants' former franchised Bar Method® studio and precluding them from using The Bar Method's confidential information that they agreed would not be used after the franchise relationship ended.

## FACTS

### I.    The Bar Method® System

The Bar Method owns and licenses a system of operating fitness studios featuring barre-based exercise classes using proprietary instructional techniques under the commercial trade name and service mark The Bar Method® ("The Bar Method® System"). Verified Complaint ("Compl.") ¶ 18. The Bar Method® System has 84 locations in the United States and Canada. *Id.* Until December 1, 2021, the Bar Method has two franchised studios in Denver, including Defendants Henderson's and Henderhiser's studio operating in the Cherry Creek neighborhood of Denver (the "Cherry Creek Studio") which closed on November 30, 2021, and was located less than six miles from the other independently operated Bar Method® studio. *Id.*

The Bar Method owns the trademarks , The Bar Method®, Bar Move®, and certain other trademarks, trade names, service marks, logos, designs, and commercial systems (collectively, the "Marks"). *Id.*, ¶ 19. The Bar Method has registered its Marks on the Principal Register of the United States Patent and Trademark Office. *Id.* The Bar Method has developed The Bar Method® System, under which it licenses its franchisees to use the Marks. Compl., ¶ 20. The Bar Method has expended substantial sums of money and other resources in developing, promoting, and establishing The Bar Method® System. *Id.* As a result of The Bar Method's efforts, customers understand The Bar Method's Marks as unique, distinctive symbols for the operation of The Bar Method's franchised locations and the services they offer. *Id.*

Members are drawn to The Bar Method's franchised locations because of the Marks that identify a high level of quality and service, including unique class design and innovative exercise techniques employed by instructors who undergo lengthy and unparalleled training provided by

4

The Bar Method. Compl., ¶ 21. More specifically, Bar Method® studios feature barre-based exercise classes using proprietary and non-proprietary instructional techniques. *Id.*, ¶ 22. The Bar Method® System is designed to create a lean, firm, sculpted body and targets specifical muscles to improve balance, strength and posture. *Id*., ¶ 22. The classes combine static holding positions and minimal ranges of motion relying on control rather than momentum. *Id.* These types of low-impact isometric exercises strengthen and elongate muscles and improve posture and body alignment. *Id.* Current Bar Method® classes generally follow the same format. Compl., ¶ 22. Students begin the class with free weights and push-ups, move to the ballet bar to work their legs, glutes and abdominals, and finish on mats for core work and stretching. *Id.* Bar Method Studios offer these signature classes as well as more advanced classes that may focus on increased strength work, stretching or cardio. *Id.* Examples of some of the static holds and isometric moves used during a Bar Method® class are as follows:

     

*Id*., ¶ 80 (screenshots of common exercises in Bar Method® classes obtained from The Bar Method's online "Bar Online" courses).

## II.    The Cherry Creek BAR METHOD® Studio

Henderhiser and Henderson (collectively the "Henderson Defendants") operated the Cherry Creek Studio for over six years. *Id.*, ¶ 23. On June 3, 2019, nearing the expiration of their first franchise agreement, Henderhiser and The Bar Method executed a Franchise Agreement and

3635283.1

Amendment to Franchise Agreement (the "Amendment") (collectively the " Franchise Agreement") granting Henderhiser the right to operate the Cherry Creek Studio for an additional year three-term expiring on November 30, 2021. Compl., Exs. 1-2. Henderson personally guaranteed all of the obligations of Henderhiser under the Franchise Agreement. *Id.* ¶ 24, Ex. 1, C.

As franchisees of The Bar Method, the Henderson Defendants received the information and know-how to get a fitness studio business up and running, including studio design and layout, class offering and scheduling, training on membership and class sales, access to current and future marketing and advertising strategies, access to vendor partnerships and access to The Bar Method's comprehensive and proprietary barre instructor training. *Id*., ¶ 25. As franchisees of The Bar Method®, Henderson and Henderhiser were also provided with access to "The Bar Online," an online streaming service that allows members to take The Bar Method's proprietary barre classes online from any location. *Id*., ¶ 28.

The Bar Method also required Henderson to attend training programs where she received hours of proprietary training on how to successfully market, sell and operate her studio and on The Bar Method's proprietary barre instruction techniques. Compl., ¶ 26. The Bar Method's rigorous training programs typically take four to six months to complete. *Id.* In addition to the rigorous training required of franchisees, all instructors teaching Bar Method® classes must attend The Bar Method's teacher certification training before teaching Bar Method® classes. *Id.*, ¶ 27. The teacher certification course includes pre-training webinars and quizzes and ten hours of training and classroom practice time. *Id.* Trainees must pass an elemental manual test and an anatomy test and either submit a video to The Bar Method or invite a trainer from The Bar Method to a certification

class to get certified. *Id*., ¶ 27. During training, the trainees learn extensive techniques unique to The Bar Method including proprietary class choreographies and timing that keeps members engaged, providing hands-on and verbal adjustments to members to ensure proper form, and exercise modifications for differing body types or unique needs. *Id.* Instructors must be recertified each year. Compl., ¶ 27.

The Henderson Defendants had the benefit of learning and using this entire "System" of methods, procedures, standards, specifications, and the Marks within the model that The Bar Method created. *Id.* ¶ 29. The Bar Method® franchisees learn The Bar Method® System and therefore have significant advantages over other competitors in the studio fitness and barre fitness industry. *Id*., ¶ 30. Henderson is now using that training, and her access to The Bar Method's confidential customer data, to draw The Bar Method® customers to her newly formed competitive business, Bravence. *Id*., ¶ 31.

## III.    Relevant Terms of the Franchise Agreement

In Section 11 of the Franchise Agreement, the Henderson Defendants agreed that certain information is confidential and proprietary to The Bar Method, including The Bar Method's "Client Information" and its "methods, formulas, specifications, standards, systems, procedures, sales and marketing techniques, knowledge and experience used in developing and operating Bar Method studios, including methods, techniques and process for teaching Classes and evaluating teachers and clients, as well as other information in the Operations Manual and System Standards." Compl., Ex. 1, § 11. All of the information identified as confidential and proprietary to The Bar Method in Section 11.A. is defined as the "Confidential Information." *Id.* "Client Information" is similarly defined in Section 11.B. of the Franchise Agreement as the "names, contact information,

financial information, activity-related information and other personal information of or relating to the Cherry Creek Studio's clients and prospective clients." *Id.*, § 11.B.

The Henderson Defendants acknowledged in Section 11.A of the Franchise Agreement that they do not have any interest in the Confidential Information except for the license to use it during the term of the Franchise Agreement. *Id.*, § 11.A. They also acknowledged that The Bar Method and its affiliates own all rights, title and interest in the Confidential Information and that The Bar Method considers the Confidential Information trade secrets. *Id.* In exchange for the benefits of a license to use the Confidential Information and for the other benefits conveyed by the Franchise Agreement, the Henderson Defendants agreed that they: (a) "will not use any Confidential Information *in any other business or capacity,* whether during or after the Term" (emphasis added); (b) "will keep the Confidential Information absolutely confidential . . ."; and (c) "will not sell, trade or otherwise profit in any way from the Confidential information, except during the Term using methods [The Bar Method] approve[s]." *Id.* (emphasis added).

The Henderson Defendants also agreed as follows:

> 16.C.  <u>Confidential Information.</u> You agree that, when this [Renewal Franchise] Agreement expires or is terminated, you and your Owners will immediately cease using any Confidential Information, whether directly or indirectly through one or more intermediaries, in any business or otherwise and return to us all copies of the Operations Manual and any other confidential materials that we have loaned you. Without limiting the generality of the foregoing, you agree that:
>
> (1) the Client Information is part of [the] Confidential Information and our property. Therefore you agree that, when this Agreement expires or is terminated, you must provide us a copy of, or access to, all Client Information then existing and you and your Owners may not directly or indirectly sell, trade or otherwise profit in any way from any Client Information at any location or any time following the expiration or termination of this Agreement.

Compl., Ex. 1, § 16.C.

In exchange for the grant of rights to operate the Cherry Creek Studio and the other rights granted under the Franchise Agreement, the Henderson Defendants agreed they would not compete with The Bar Method for a two-year term following the expiration or termination of the Franchise Agreement as follows, in Section 16.D of the Franchise Agreement:

> 16.D. <u>Covenant Not to Compete.</u> Upon expiration (without the grant of a successor franchise) or termination of this Agreement for any reason . . . you and your Owners agree that, for two (2) years beginning on the effective date of termination or expiration (subject to extension as provided below), neither you nor any of your Owners, nor any members of your or their Immediate Families, will:
>
> (1)     have any direct or indirect, controlling or non-controlling ownership interest in any Competitive Business which is located or providing services to clients at any location: (a) at the Site; (b) within a five (5)-mile radius of the Site; or (c) within a five (5)-mile radius of any Bar Method Studio then operating or under construction on the effective date of termination or expiration, provided that this restriction will not apply to the ownership of shares of a class of securities which are publicly traded . . .
>
> (2)     perform services as a director, officer, manager, teacher, employee, consultant, representative or agent for a Competitive Business which is located or providing services to clients at any location (a) at the Site; (b) within a five (5)-mile radius of the Site; or (c) within a five (5)-mile radius of any Bar Method Studio then operating or under construction on the effective date of termination or expiration.

*Id.*, § 16.D. The term "Competitive Business" is defined in Section 12 as "any gymnasium, an athletic of fitness center, a health club, an exercise or aerobics studio, or one or more similar facilities or businesses offering barre-based or other fitness-based instruction, or an entity that grants franchises or license for any of these types of businesses, other than a Bar Method Studio operated under a franchise agreement with us. *Id.*, § 12. The Henderson Defendants agreed that

9

the time period of the restrictions in Section 16.D will be automatically extended for each day which any person is not in full compliance. *Id.*, § 16.D.

In Section 18.C of the Franchise Agreement, the Henderson Defendants agreed that if The Bar Method prevails in any legal proceeding to enforce Defendants' compliance with the Franchise Agreement, then Defendants will reimburse The Bar Method for any costs and expenses, including reasonable attorneys' fees and costs. *Id.*, § 18.C. In Section 18.F, The Bar Method and the Henderson Defendants agreed to submit any disputes to arbitration, provided, however, the parties reserved the right to "obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction. In that case, [the parties] must contemporaneously submit the dispute for arbitration on the merits."[1] Compl., Ex. 1, § 18.F. Last, in Section 18.G of the Franchise Agreement, The Henderson Defendants agreed that any disputes arising from or relating to Sections 11.A, 11.B (Defendants' confidentiality obligations), 12 (the in-term covenant not to compete), 16.C and 16.D (Defendants' post-term covenant not to compete and post-term confidentiality obligations) are governed by Colorado law since that is where the Cherry Creek Studio is located. *Id.*, § 18.G.

## IV.    The Henderson Defendants Take Steps to Open Bravence, a Competitive Barre Business, Less Than Two Miles Away.

In the spring of 2021, Henderson approached The Bar Method asking for approval to relocate the Cherry Creek Studio to a vacant location about a mile and a half away. Compl., ¶ 47. Henderson informed The Bar Method she liked the location because it was near her existing client

---

[1]    To comply with Section 18.F. of the Franchise Agreement, The Bar Method is contemporaneously filing a Demand for Arbitration with the American Arbitration Association in pursuit of its claims for monetary damages against Defendants.

10

base. *Id.* The new location, a former restaurant and bar located at 660 South Colorado Boulevard, Glendale Colorado (the "Glendale Site") was not approved by The Bar Method because it did not meet the size and quality standards of the franchise system. *Id.* ¶ 48.

Once The Bar Method denied the relocation to the Glendale Site, Henderson engaged in some communications with The Bar Method over her potential involvement in a fitness business at this same location once the Franchise Agreement expired. *Id.*, Ex. 3. Henderson indicated she had no intention of operating a barre-based business or using The Bar Method's customer information for a new business, but was interested in seeing if The Bar Method would allow her to operate another fitness business, such as a yoga studio, within the five-mile radius of her two-year post-term noncompete. *Id.* The communications ultimately fell silent and The Bar Method never agreed to modify the restrictions. *Id.*

In late September 2021, representatives for The Bar Method learned Henderson was advertising a new fitness business, "Bravence Wellness Collective," opening at the Glendale Site. Compl., ¶ 51. Social media posts from this time period showed Henderson intended to operate Bravence as a studio offering competitive fitness classes, namely barre classes, to consumers and was soliciting clients using the same telephone number as the Cherry Creek Studio. *Id.*, ¶ 53, Exs. 5–6, For example, on September 16, 2021, Bravence advertised its opening on Instagram and Facebook stating, "GIVEAWAY – We're turning a bar into barre!" *Id.*, Ex. 6. Upon receiving a cease and desist letter from The Bar Method demanding Defendants cease all involvement in a competitive barre business, Defendants tried to hide their activities by changing the post to say, "We're turning a bar into a wellness collective!" *Id.*, Ex. 10.

11

In addition to starting a competitive barre and fitness business less than two miles away from their Cherry Creek Studio, Defendants also began using the Client Information and customer goodwill to solicit customers of The Bar Method to Bravence. Compl., ¶ 54. As stated above, Defendants used the telephone number of the Cherry Creek Studio for their competitive business, presumably to steer Bar Method® customers to Bravence. *Id.*, Ex. 5. Bravence also diverted followers of the Cherry Creek Studio's Instagram account obtained by The Bar Method's Marks and goodwill to the Bravence Instagram site. *Id.*, ¶ 55, Ex. 7. Comments about the opening of Bravence reflect that these Bar Method members were solicited to transfer to Bravence. *Id.* (comment from customer stating, "the barre studio is moving . . . [w]e should go to the new opening!")(emphasis added).

After attempts to obtain the Henderson Defendants' compliance with the terms of the Franchise Agreement failed, The Bar Method filed suit in the Ramsey County, Minnesota District Court, located near its headquarters, in the matter captioned *The Bar Method Franchising, LLC v. Henderhiser LLC, et al.*, Court File No. 62-CV-21-5471 (the "Minnesota Lawsuit"). Compl., ¶¶ 56–60, Exs. 8–9, 11–12. The Bar Method filed a motion for a temporary injunction the same day, and the motion was scheduled for October 19, 2021. *Id.*, ¶ 60. By October 17, 2021, the parties entered into an Agreement to Stay Temporary Injunction Motion to work on settlement and, in exchange The Bar Method's agreed to stay the Minnesota Lawsuit until November 1, 2021. *Id.*, ¶ 61, Ex. 13.

Defendants opposed The Bar Method's motion for a temporary injunction. *See, e.g.,* Tegt Decl., Ex. 2 (Affidavit of Laura E. Henderson in Opposition to Motion for a Temporary Injunction). In doing so, Henderson submitted an affidavit on November 10, 2021 to the Court

falsely representing that Bravence "<u>is not remotely close to being operational</u>; it is currently an old bar that has been gutted and currently lacks working bathrooms." *Id.*, Ex. 2 at ¶ 4 (emphasis added). Henderson also mispresented to the Court that she did not intend to offer barre classes at Bravence and would instead offer yoga and "strength-based boot camp classes." *Id.* at ¶ 3.

## V.    Defendants Fraudulently Induce The Bar Method to Enter the Settlement Agreement.

On December 2, 2021, the parties signed a Settlement Agreement backdated to December 1, 2021. Compl., Ex. 14. Under the terms of the Settlement Agreement, The Bar Method agreed to dismiss the Minnesota Lawsuit and release all claims against Defendants in exchange for the Henderson Defendants' agreement not to compete with The Bar Method as follows:

> 3.)    <u>Noncompete Obligations</u>. The Henderson Defendants, and each of them individually, agree that, commencing on the date of execution of this Agreement and for a term expiring at 11:59 p.m. on May 31, 2023 (the "Restricted Period"), that they will not, whether as an owner, employee, agent, consultant or otherwise, engage in any business offering barre classes, as defined below, within a five (5) mile radius of 311 Steele Street, Suite 200, Denver, Colorado 80206 or within five (5) miles of any other The Bar Method Studio existing as of the date of this Agreement (the "Restricted Territory").
>
> (a)    "Barre class" means a workout technique that is taught to focus on specific muscle groups to improve balance, strength and posture. A barre class predominately uses the participant's own body weight for resistance and may include a few basic props: free weights, mats, sticky socks, sliders, a ball, or a resistance band. A barre class focuses on employing low-impact isometric exercises, which are static holds that do not require a range of motion. The minimal range of motion in a barre class relies on control rather than momentum.

*Id.* Defendants also agreed that they would not use any of the customer information acquired from the Cherry Creek studio to solicit customers to Bravence. *Id.*, ¶ 4.

The parties agreed in the Settlement Agreement that the Franchise Agreement expired effective November 30, 2021, however the Defendants expressly acknowledged that certain Franchise Agreement terms survived termination or expiration, specifically the obligations set forth in Sections 11 and 16, including the obligations not to use The Bar Method's trade secret or confidential information (§ 11.A); the obligation not to profit in any way from The Bar Method's confidential information (§ 11.A); the obligation not to use The Bar Method's Client Information (§§ 11.B and 16.C.1); and the obligation to immediately cease using all of The Bar Method's confidential information, expressly including The Bar Method's "proprietary methods, techniques and processes for teaching Classes and evaluating teachers and clients." (§ 16.C). *Id.*, ¶ 2. The parties also agreed in Paragraph 7(c) that any party may seek injunctive relief in any court of competent jurisdiction to enjoin any violations of the Settlement Agreement. Compl., Ex. 14, ¶ 7(c). In Paragraph 7(e) of the Settlement Agreement, the parties agreed that, "[i]f any legal action is instituted to enforce the provisions of this [Settlement] Agreement or the exhibits attached hereto, the prevailing party in that action will be entitled to recover its costs and attorneys' fees related to the filing and prosecution of that action." *Id.*, ¶ 7(e).

**VI.    The Bar Method Immediately Discovers Defendants' Fraudulent Inducement of the Settlement Agreement and Bad Faith Misappropriation of The Bar Method's Trade Secrets.**

On December 6, 2021, just four days after the Settlement Agreement was executed, representatives of The Bar Method examined Bravence's social media sites and website to ascertain whether Defendants were in compliance with the Settlement Agreement. *Id.*, ¶ 68. The Bar Method was shocked by what it found. *Id.*

14

Bravence's studio management and class scheduling web platform (hosted by a well-known studio fitness scheduling provider called "Mindbody") actively advertises "barre" classes and Henderson's biography references "barre." Compl., ¶ 69–70:





Bravence began offering these barre classes on December 1, 2021, one day before the Settlement Agreement was signed. In fact, when Bravence opened its doors, the only classes it offered were barre classes exactly like the classes offered by The Bar Method®. *Id.*, ¶ 69.

Bravence is also using the term "barre" for search engine optimization to draw consumers interested in barre classes, which Bravence expressly agreed not to teach. *Id.*, ¶ 71, Ex. 15. In other places on Bravence's website, Henderson and Bravence swap the use of the term "barre" with "functional movement," presumably to hide their fraudulent activity and theft of The Bar Method's trade secrets and Confidential Information. *Id.*, ¶ 72. For example, the Bravence website describes its "Signature" class offerings as follows: "Signature 60 [minute] classes are founded in the roots of our technique; total body, low impact, form focused, and a highly efficient workout. Signature classes will target your major muscle groups through functional movements . . .". *Id.*

Bravence has also hired eight former Bar Method® instructors, including Henderson, and is openly advertising its theft of The Bar Method's proprietary methods of barre instruction created

15

from years of industry research and development. Compl., ¶¶ 73–76, Exs. 16–17. For example, Bravence is advertising that its instructors "complete an extensive training program and routinely participate in professional development to ensure they practice the safest and most effective techniques." *Id.*, Ex. 16. This "extensive training program" is actually The Bar Method's rigorous teacher certification process, evidenced by the fact that several of the former Bar Method® instructors advertise they were "certified" to teach Bravence's supposedly unique "functional movement" techniques in the same year they obtained certification from The Bar Method. *Id.,* Ex. 17. In its first few days of operation, the only classes offered at Bravence were barre classes taught by former Bar Method®-trained instructors from the Henderson Defendants' recently closed Cherry Creek Studio. Compl., Ex. 18 (December 6-12, 2021 class listing).

On December 7, 2021, The Bar Method observed one of Bravence's online streaming "signature" classes taught by Kristyn Gibbs, a former Bar Method® certified instructor. Compl., ¶¶ 78-80. The class was exactly like a Bar Method® barre class and used The Bar Method's proprietary instruction, verbal adjustment cues, and choreography and followed the exact same sequence of a Bar Method® class, beginning with a warm up, arm strength work using light free weights, followed by thigh and glute work at the ballet bar, and then core work and stretching on mats on the floor. *Id.* Specific muscle groups were targeted in the Bravence "signature" class and the class relied on body weight work, light free weights and resistance bands. *Id.* All of the students wore sticky socks which are used almost exclusively in barre classes. *Id.*, ¶ 79. The exercises were comprised primarily of static holds with isometric exercises performed in very small movements, often directed by Ms. Gibbs to move a static hold "up an inch [and] down an inch," an instruction common to barre classes. *Id.*

16

The following is a comparison of screenshots taken during the Bravence "signature" class with screenshots obtained from The Bar Method's classes:

**BRAVENCE CLASS**                    **BAR METHOD® CLASS**

 

 

 

3635283.1










Compl., ¶ 80.

Students participating in Bravence's classes also appear to clearly understand that the classes disguised as "functional movement" classes are actually barre classes. Compl., ¶ 81. A

18

review on Bravence's Facebook page from December 2, 2021, the same day the Settlement Agreement was signed, provides:



*Id.* Four days after opening, Bravence also openly flaunted its theft of The Bar Method's client base on its Facebook page, advertising that it was close to adding 150 members in its first week:



*Id.*, ¶ 82.

All of this evidence shows that at the time Defendants entered into the Settlement Agreement, on December 2, 2021, they had zero intention of honoring their obligations not to be involved in any business offering barre classes or their obligations to cease using The Bar Method's confidential information once the Franchise Agreement expired. *Id.*, ¶ 83. By December 1, 2021, Defendants were already teaching barre classes openly using The Bar Method's proprietary methods which the Henderson Defendants agreed they would not use for any other purpose outside the operation of the Cherry Creek Studio. *Id.*, ¶ 84. Defendants therefore fraudulently induced The Bar Method to dismiss the Minnesota Lawsuit and cease its pursuit of injunctive relief in reliance on Defendants' representations that they would comply with the terms

of the Settlement Agreement. Compl., ¶ 85. Defendants' opening Bravence as a barre studio after diverting The Bar Method's customers and openly stealing and using The Bar Method's confidential and trade secret information has decimated The Bar Method's goodwill in the Denver market and the harm to The Bar Method's goodwill continues every day Bravence continues to operate. *Id.*, ¶ 86. Bravence's actions also threaten The Bar Method's nearby franchisee and The Bar Method's entire franchise system from ongoing irreparable harm. *Id.*

## LEGAL ARGUMENT

Immediate injunctive relief is necessary to enjoin the Henderson Defendants and Bravence from breaching the restrictive covenants in the Franchise Agreement and from misappropriating The Bar Method's trade secrets and misusing its goodwill. The purpose of emergency injunctive relief is to preserve the status quo and the relative positions of the parties until a trial on the merits can be held. *See Schrier v. Univ. of Colo.*, 427 F.2d 1253, 1258–59 (10th Cir. 2005). Under Rule 65, the Court may grant injunctive relief where the movant demonstrates the following factors: (1) a likelihood of success on the merits; (2) a likelihood the movant will suffer irreparable harm in the absence of relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *DoubleClick Inc. v. Paikin,* 402 F. Supp. 2d 1251, 1255 (D. Colo. 2005); *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.,* 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (temporary restraining order and preliminary injunction requirements are the same). These factors are all satisfied here.

I.    **The Bar Method and Its Entire Franchise System Will Suffer Irreparable Injury Unless the Henderson Defendants are Enjoined from Violating Their Restrictive Covenants and Defendants are Enjoined from Misappropriating The Bar Method's Trade Secrets.**

The Bar Method first pursued injunctive relief against Defendants before Bravence opened its doors to prevent the immeasurable harm The Bar Method and its other Denver franchisee would

20

suffer if a competitive barre business created from The Bar Method's proprietary methods of barre instruction and boutique fitness studio operation opened with an established client base of stolen Bar Method® clients. Defendants misrepresented to The Bar Method that they would open Bravence without offering barre classes and without using The Bar Method's Confidential Information to change the course of the proceedings and halt The Bar Method's pursuit of court-ordered relief. Defendants, however, never intended to stop their anti-competitive activities and immediately opened Bravence offering not only the barre classes they promised they would not provide, but Bar Method® classes following the same sequence, choreography and proprietary techniques, all while parading the instructors' Bar Method®-taught certifications.

Defendants' unlawful actions and utter disregard of fair legal processes has virtually decimated The Bar Method's goodwill in the Denver market. This motion now serves to protect from the continuing ongoing harm caused by Bravence that grows each day Bravence is permitted to operate and divert customers using The Bar Method's proprietary methods developed over twenty years. Injunctive relief will also protect The Bar Method from the irreparable harm caused if other franchisees learn they can openly defy their obligations by opening competitive studios built on The Bar Method's trade secrets which will cause the franchise system to unravel. The effects of Defendants' actions are immeasurable and not quantifiable by monetary damages. Injunctive relief is needed.

### A.    The Bar Method Has Been Actually Harmed and Continues to Be in Imminent Danger of Continuing Harm From a Loss of Goodwill.

While a finding of irreparable harm is not automatic, violations of noncompete provisions routinely result in a finding irreparable harm. *See Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV-2020 WL 6119470, at *10 (D. Colo. Oct. 16, 2020). Indeed, the present issue before this Court is not a new one and "the majority of courts that

have considered the question have concluded that franchising companies suffer irreparable harm when their former franchisees are allowed to ignore reasonable covenants not-to-compete." *Id.* (citing *Bad Ass Coffee Co. of Haw., Inc. v. JH Enters., LLC*, 636 F. Supp. 2d 1237, 1249 (D. Utah 2009)); *see also Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 195 (E.D.N.Y. 2013). Breaches of covenants not to compete by franchisees cause irreparable harm to the franchisor and franchise system by, among others, causing a loss of customers or customer goodwill and harming the integrity of the franchise system. *See Fitness Together*, 2020 WL 6119470, at *11 (fitness franchisor's loss of customers and threat to the entire franchise model constitutes irreparable harm); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991) (finding irreparable harm from noncompete violation where the use of misappropriated trade secrets dilutes the uniqueness of the plaintiff's services). Likewise, "when a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed." *Core Progression Franchise LLC v. O'Hare,* No. 21-CV-0643- WJM-NYW, 2021 WL 1222768, at *9 (D. Colo. Apr. 1, 2021) (granting fitness franchisor's motion for a preliminary injunction and citing *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 872 (D. Colo. 2014)).

The Bar Method takes great care to protect its customer goodwill and works to ensure that, in the event a studio closes, members get transferred to other studios so those members can enjoy the same high level of training and other services offered by their former studio. This is particularly the case in the wake of the pandemic where The Bar Method increased its online class offerings through The Bar Online, a service that has helped The Bar Method retain its client base even when a studio closes. Defendants' actions have denied The Bar Method and its franchisees of that opportunity. Rather than transferring clients to the neighboring Bar Method® studio in Denver and

retaining clients to take classes through The Bar Online, Defendants actions are causing The Bar Method to lose its client base in the Denver area by drawing them into in-studio classes at Bravence taught using The Bar Method's highly proprietary methods of instruction and selling competitive online streaming classes that draw consumers away from the neighboring Denver Bar Method® studio and also away from The Bar Online.

The harm The Bar Method is suffering from the Henderson Defendants' violation of their obligations not to compete and their use of The Bar Method's Client Information and other proprietary information is real and absolute. In addition to the irreparable harm caused by the theft of Client Information, evidenced by Bravence opening its doors to an established client base of 150 members, The Bar Method has also expended substantial sums of money in developing proprietary barre instruction techniques requiring lengthy and rigorous training which has generated substantial brand goodwill used by franchisees to beat the competition. This proprietary method of instruction draws customers to the brand. Notably, Henderson became a franchisee of The Bar Method® having no prior experience in instructing barre fitness classes or in operating a fitness studio. The Bar Method taught Henderson how to operate a studio fitness business and she is now using that proprietary information in concert with Bravence to openly divert current and prospective customers away from The Bar Method® System. This is precisely the type of harm protectable by injunctive relief.

Last, The Bar Method seeks by this motion to rescind the Settlement Agreement and enforce the noncompete terms as written in the Franchise Agreement. *Infra*, §§ II.A-B. Merely enforcing the narrower restrictions in the fraudulently-procured Settlement Agreement will not fully alleviate the irreparable harm The Bar Method is suffering nor will they restore the status quo. The Bar Method agreed to allow Defendants to offer other non-barre fitness based classes at

Bravence because Bravence had not yet opened and Defendants would not be able to use the Confidential Information obtained as franchisees at The Bar Method to divert The Bar Method's client base desiring to take barre classes. By disregarding their promises not to offer barre classes and by teaching identical barre classes at Bravence, Defendants have already misappropriated a substantial portion of The Bar Method's Denver clientele and therefore merely requiring Defendants to cease offering barre classes is not a sufficient remedy. Defendants should be ordered to cease operating any fitness business within the noncompete radius entirely, including their streaming barre business. This is the only way The Bar Method and its neighboring franchisee may recoup the incalculable loss of clients and goodwill.

**B.    The Harm to the Entire Bar Method® System is Both Substantial and Irreparable.**

Courts have consistently held that unfettered violations of a franchisee's covenant not to compete harm the franchisor and the entire franchise system. *See, e.g., Dry Cleaning To-Your-Door, Inc. v. Waltham Ltd. Liab. Co.,* No. 07-cv-01482-WDM-MJW, 2007 WL 4557832, at *3 (D. Colo. Dec. 20, 2007) ("[T]erritorial integrity and covenants not to compete are essential to maintaining [an] established franchise network" such that the harm to the franchisor's goodwill is "not readily remedied by damages."). Violations of covenants not to compete can unravel an entire franchise system and this threatened loss of an entire business enterprise warrants injunctive relief. For example, the former Chief Judge of the United States District Court for the District of Minnesota, in enforcing a covenant not to compete which restricted a fitness franchise from operating a competitive business stated:

> Without the preliminary injunction, [the franchisor] will be unable to attract new franchisees to [the area] and its current franchisees may think that they can violate their franchise agreements with impunity after having taken advantage of [the franchisor's] goodwill

> to build their businesses, potentially causing [the franchisor's] entire franchise system to unravel.

*Anytime Fitness, Inc. v. Reserve Holdings, LLC,* No. 08–4905 (MJD/JJK), 2008 WL 5191853, *6

(D. Minn. Oct. 8, 2008).

> [The franchisor] has further established irreparable harm to the franchise system as a whole. If the non-compete covenant is not enforced, . . . franchisees may think they can take advantage of [the franchisor]'s knowledge, information, training, and goodwill to build a business, and then leave the system and start their own identical business to avoid paying fees.

*Id.; see also Anytime Fitness, LLC v. Edinburgh Fitness LLC,* No. 14-348 DWF/JJG 2014 WL 1415081, at *7 (D. Minn. Apr. 11, 2014) (same); *Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC,* 918 F. Supp. 2d 407, 419 (E.D. Pa. 2013) ("If plaintiff fails to enforce the Non-Compete Covenant in the instant Franchise Agreement, other franchisees will be encouraged to violate such covenants . . . other franchisees would get the message that they could defraud with impunity.") (citations omitted); *Rita's Water Ice Franchise Co.*, *LLC,* No. 10-4297, 2011 WL 101694, at *8 (E.D. Pa. Jan. 11, 2011) (the "value of Plaintiff's franchise is lowered if it is unable to enforce a noncompete clause").

Much like in the cases cited above, the Henderson Defendants' violations of their covenant not to compete will draw the attention of the other Bar Method® franchisees who communicate regularly through social media. If The Bar Method cannot protect its other franchisees by enforcing its covenants not to compete, the other franchisees, and particularly the neighboring Denver franchisee, will know it. Thus, if the Henderson Defendants are permitted to continue to ignore their contractual obligations not to compete with The Bar Method, the message to both prospective and current franchisees will be that it is more beneficial to operate an independent business than one associated with The Bar Method® System. This threat is elevated by an industry under significant stress from the pandemic. Simply put, current and former Bar Method® franchisees

may attempt to reap the benefits from the System without incurring any of the obligations. This potential to "unravel" the entire System is manifest. *Reserve Holdings,* 2008 WL 5191853 at *6.

## II.    THE BAR METHOD IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

The Bar Method's motion should be granted to rescind the fraudulently-procured Settlement Agreement, enforce the restrictive covenants in the Franchise Agreement and enjoin all Defendants from misappropriating The Bar Method's trade secrets and its confidential information. To demonstrate a likelihood of success on the merits, a plaintiff must "present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.'" *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003); *Cont. Oil Co. v. Frontier Ref. Co.,* 338 F.2d 780, 781 (10th Cir. 1964). This burden is lower than showing an "overwhelming" likelihood of success, or "positively" establishing a right to relief on the merits. *Atchison, Topeka and Santa Fe Ry. Co. v. Lennen,* 640 F.2d 255, 261 (10th Cir. 1981). And where the three "harm" factors tip "decidedly" in the moving party's favor, the "probability of success requirement" is relaxed further; the moving party "need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Heidemann v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003). Even if this "relaxed" standard does not apply, The Bar Method meets its burden.

### A.    The Bar Method Is Likely to Prevail on the Merits of Its Claim Seeking Rescission of the Settlement Agreement as a Result of Defendants' Fraudulent Inducement of the Same.

A party's intention not to honor a settlement agreement at the time it is entered constitutes fraud and rescission is a proper remedy so long as the defrauded party elects to rescind the contract to restore the conditions existing before the agreement was made. *Trimble v. City & Cty. of Denver*, 697 P.2d 716, 723-24 (Colo. 1985) ("The trial court found that even at the time the settlement

26

agreement was made [the defendant] had no intention of abiding by it. The court found this was a false representation of fact constituting fraud."); *superseded by statute on other grounds as stated in Colorado Dep't of Transp. v. Brown Grp. Retail, Inc*., 182 P.3d 687 (Colo. 2008); *see also Jenner v. Bloor*, No. 03-CV-01344-MSKCBS, 2008 WL 4297021, at *2 (D. Colo. Sept. 11, 2008) ("To show that the Defendants procured [a settlement agreement and] the [corresponding] dismissal by fraud, [plaintiff] would have to show that, at the time they entered into the settlement agreement . . . , the Defendants lacked any intention to [perform]"). Likewise, "[i]t is a well-established rule that where a release of a cause of action is procured by fraud the defrauded party may choose any one of three remedies [including] . . . su[ing] for rescission and offer[ing] to return the consideration." *Theda v. Norfolk So. Corp.,* 953 F.2d 1392 (10th Cir. 1992) (citation omitted).

The Bar Method has satisfied its burden of showing it is likely to prevail on the merits of its fraud claim by proving Defendants had zero intent of honoring the terms of the Settlement Agreement including the: (a) covenant not to compete prohibiting the Henderson Defendants from engaging in any business offering a "barre class" within a five mile radius from the Cherry Creek Studio or any other Bar Method® studio for eighteen months; (b) the Henderson Defendants' obligations to maintain The Bar Method's Confidential Information, including Client Information and its unique class choreography and teacher training, in confidence; (c) its obligations not to solicit Bar Method® clients; and (4) its obligations to remove all solicitations for barre classes. Compl., Ex. 14.

Unbeknownst to The Bar Method, at the time Defendants signed the Settlement Agreement, dated December 1, 2021 but signed December 2, 2021, Defendants had already commenced advertising and offering barre classes fitting squarely within the definition of a "barre class" defined by the Settlement Agreement. *See, e.g.,* Compl., ¶ 80 (screenshots comparing

Bravence class with The Bar Method® classes). Client reviews on Bravence's Mindbody studio management/client scheduling website shows that Bravence began offering classes on December 1, 2021 and a December 2, 2021 client review on Facebook says Bravence is a "perfect place for a <u>barre</u>, yoga or strength workout." *Id.*, ¶ 82 (emphasis added). All of this happened on the same date Defendants executed the Settlement Agreement, evidencing a clear intent to dupe The Bar Method into dismissing the Minnesota Lawsuit and forego its pursuit of injunctive relief allowing Defendants to continue their destructive path of opening a new barre studio founded on The Bar Method's stolen Confidential Information.

As additional evidence of Defendants' intent never to honor the terms of the Settlement Agreement, Bravence's website advertises itself as a "barre" studio and Henderson's biography indicates she teaches "barre." *Id.*, ¶ 70. These websites were first viewed by The Bar Method on December 6, 2021, however there is no reason to doubt that the website was live on the date the Settlement Agreement was signed, particularly since Bravence was already offering barre classes to the public and the former members of the Cherry Creek Studio. The teacher biographies on Bravence's website also openly advertise Bravence's theft of The Bar Method's confidential training techniques by claiming the instructors received their rigorous and specialized training on Bravence's supposed "functional movement" classes on the same dates those teachers were certified to teach The Bar Method® classes. *Id.*, Ex. 17. The classes offered by Bravence in its first few days of operation were only taught by these Bar Method® certified instructors. *Id.*, Ex. 18. All of this was in motion (or had already occurred) before Defendants signed the Settlement Agreement evidencing an intent to dupe The Bar Method into resolving the Minnesota Lawsuit.

In dismissing the Minnesota lawsuit and releasing its claims against Defendants, The Bar Method relied on Defendants' representations that they would honor the settlement terms. In turn,

Defendants defrauded The Bar Method causing the destruction of its client base in Denver market, with the harm compounding daily as Bravence continues to operate and draw more clients away from The Bar Method. The Bar Method has shown a likelihood of prevailing on the merits of its fraud claim to rescind the Settlement Agreement.

1.    *Any Arguments That Bravence's Classes are Outside the Definition of a "Barre Class" are Wholly Disingenuous.*

Based upon the communications with Defendants' counsel in the days leading up to this motion, The Bar Method anticipates Defendants are going to argue that their class offerings fall outside the scope of the Settlement Agreement's definition of a "barre class" and their actions are permissible. First, this argument entirely ignores Defendants' other obligations in the Settlement Agreement which Defendants also never intended to honor. For example, Defendants also agreed they would not use The Bar Method's Confidential Information, including its proprietary methods of barre instruction and Client Information, after the termination of the Franchise Agreement. At the time of reaffirming this obligation, Defendants had already retained seven other Bar Method® instructors who immediately advertised they were highly trained and certified to teach Bravence's supposed "functional movement" classes after receiving certifications to teach Bar Method® classes. Defendants' arguments also ignores the open theft of The Bar Method's Client Information, advertising that Bravence built a client base of over 150 students in just four days.

Defendants' attempts to distinguish Bravence's classes from the definition of a "barre class" in the Settlement Agreement are equally unavailing, as the comparison of the photographs of the two barre classes makes patently obvious. Compl., ¶ 80. Any attempt to now distinguish Bravence's classes using the exact same sequence and choreography of identical static strength holds and small controlled isometric movements taught by former Bar Method instructors advertising their Bar Method® certifications and the same types of equipment including resistance

29

bands, free weights and sticky socks, and selling those classes on a website advertising "barre" workouts is highly disingenuous.[2]

These arguments are also directly contradictory to Defendants' use of the word "barre" on its website, the use of "barre" as a search engine optimization term to draw consumers to Bravence and even a consumer's Facebook review of a Bravence class. Compl., ¶¶69-70, 80, Ex. 15. This is particularly true because the definition of a "barre class" in the Settlement Agreement is identical to how Henderson described a "barre class" in her affidavit to the Minnesota Court. *Compare* Compl., Ex. 14 (Settlement Agreement ¶ 3(a)) *with* Tegt Decl., Ex. 2 (Henderson Affidavit) at ¶ 11. Defendants cannot plausibly deny that Bravence's class offerings are not "barre classes" when Henderson has made it clear she understands the definition and uses the same terminology to draw clients to Bravence.

Defendants agreed Henderson and Bravence would not teach barre classes, not that they would teach barre classes and just call them something else. Defendants never intended to stop their anti-competitive activity and they mislead The Bar Method into signing the Settlement Agreement and dismissing the Minnesota lawsuit.[3] The Bar Method is likely to prevail on its fraud claim to rescind the Settlement Agreement and enforce the terms of the Franchise Agreement, discussed in greater detail below.

---

[2]  This is particularly the case where Henderson swore to the Minnesota court that she never intended to offer barre classes at Bravence and would instead offer "strength-based boot camp classes" and that, just three weeks before Bravence opened its doors, it was "not remotely close to being operational." Tegt Decl., Ex. 2, Henderson Aff. at ¶¶ 3–4.

[3]  The Franchise Agreement permits The Bar Method to pursue relief in Minnesota again since that is where The Bar Method's headquarters is located. Based on Defendants' utter disregard of the Settlement Agreement, The Bar Method has elected to pursue relief in this Court where the defendants reside in the event contempt proceedings are needed.

**B.    The Bar Method is Likely to Prevail on the Merits of its Breach of Contract Claims Regarding the Henderson Defendants' Violation of Their Covenants Not to Compete and Covenants of Confidentiality.**

The Bar Method is likely to prevail on its claims against the Henderson Defendants for breaching the noncompete and nondisclosure obligations in the Franchise Agreement. The Bar Method seeks injunctive relief preventing the Henderson Defendants from breaching the Franchise Agreement and Guaranty by operating a competing fitness center less than two miles away from their former Bar Method® studio and using The Bar Method's stolen Confidential Information to do so. Colorado courts have said "[w]here there is a non-competition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course. Damage is presumed to be irreparable and the remedy at law is considered inadequate." *I Can't Believe It's Yogurt v. Gunn*, No. CIV. A. 94–OK–2109–TL, 1997 WL 599391, at *20 (D. Colo. April 15, 1997) (quoting *Miller v. Kendall*, 541 P.2d 126, 127 (Colo. App. 1975)).

Defendants' conduct is expressly prohibited by the plain language of the Franchise Agreement. The Bar Method is requesting that this Court do nothing more than enforce the plain terms of the parties' written agreements and protect The Bar Method from Defendants' injurious conduct. The merits of this case strongly favor The Bar Method.

*1.    The Covenants Not to Compete are Enforceable Under Colorado Law.*

Colorado law has a restrictive covenant statute of general application that generally prohibits covenants against competition, however the statute expressly exempts a variety of agreement that arise outside of the employment context, including the type at issue in this case– one that protects trade secrets. Colo. Rev. Stat. § 8-2-113(2); *Core Progression Franchise,* 2021 WL 1222768, at * 7 (enforcing covenant not to compete in franchise agreement to preclude former franchisee from operating a competitive fitness business within a 25-mile radius because the covenant protects the franchisor's trade secrets as required by Colo. Rev. Stat. § 8-2-113); *Fitness*

31

*Together*, 2020 WL 6119470, at *9 (same, but a 3-mile radius); *Quizno's Corp. v. Kampendahl*, No. 01C6433, 2002 WL 1012997, at *6 (N.D. Ill. May 20, 2002) (enforcing agreement under Colorado law). Colorado law generally enforces non-competition agreements between franchisor and franchisee under the trade secret exemption. See John R. Paddock, Jr., EMPLOYMENT LAW & PRACTICE § 5.12 (West Colorado Practice Series 2002) ("There is no statutory restriction concerning noncompetition agreements between businesses; therefore . . . franchisors may prohibit franchisee businesses from competition."). Individuals owners of franchised business also fit squarely within this exemption. *See Fitness Together*, 2020 WL 6119470, at *9 (finding owner of franchisee limited liability company meets exemption to Colo. Rev. Stat. § 8-2-113(2)).

        2.     *The Primary Purpose of the Covenants are to Protect Trade Secrets.*

To protect the trade secret exception in Colo. Stat. § 8-2-113(2), the purpose of the covenant not to compete must be the protection of trade secrets. *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997). The Court may look to various parts of the Franchise Agreement to readily determine that the primary purpose of the in-term and post-term covenants not to compete are to protect The Bar Method's trade secrets. For example, in *Gold Messenger*, the court looked to the preamble as well as the substantive provisions to determine that the covenant was drafted with the purpose of protecting trade secrets. *Id.*; *see also Haggard v. Spine*, No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *5 (D. Colo. June 12, 2009); *Fitness Together,* 2020 WL 6119470 at *9 (the franchisor "has provided strong evidence that the Franchise Agreements were written to protect trade secrets."). The same may be done here. For example, the Preamble to the Franchise Agreement provides, among other things, an acknowledgment that:

> (1)    We . . . have developed a method of constructing and operating fitness studios which are primarily identified by the Marks (defined [within]) and use the Franchise System (defined [within]) Bar Method Studios currently feature barre-based exercise classes using proprietary . . . instructional techniques, formats and methods . . .

* * *

> (3)    We offer franchises to own and operate a Bar Method Studio offering the Classes, products, services and amenities we authorize (and only the Classes, products, services and amenities we authorize) and using our business system, business formats, proprietary instructional techniques and processes, methods [and] procedures . . .

Compl., Ex. 1, § 1.A. The Henderson Defendants also expressly acknowledged the following:

> [Y]ou have read this Agreement and our Franchise Disclosure Document and understand and accept that the terms and covenants in this Agreement are reasonable and necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Bar Method Studio, and to protect and preserve the goodwill of the Marks.

*Id.*, § 20(j). It is evident from the preamble and the acknowledgement that the Franchise Agreement was entered into with the purpose of protecting trade secrets. When read in conjunction with the confidentiality obligations (§ 11) and the in-term (§12) and post-term (§ 16.D) covenants not to compete, it is clear that the covenants not to compete serve to protect The Bar Method's Confidential Information. Thus, as in *Gold Messenger*, "by both its purpose and its scope, the covenant is, in essence, for the protection of trade secrets." 937 P.2d at 911.

> 3.    *The Covenants Not to Compete Protect a Legitimate Business Interest.*

Courts repeatedly recognize the importance and legitimate business interests served through the enforcement of non-compete agreements in the context of franchise agreements. *See, e.g.*, *Quizno's Corp.*, 2002 WL 1012997, at *6 ("The non-compete covenant, which prohibits only the operation of a sandwich shop within a narrow geographical area, has the legitimate purpose of protecting Quizno's trade secrets . . . ."). Courts applying Colorado law will enforce a covenant not to compete in a franchise agreement if it is narrowly tailored to protect the franchisor's trade secrets and legitimate business interests. *Gold Messenger*, 937 P.2d at 911. A franchisor has a legitimate business interest in precluding a franchisee from trading on the franchisor's goodwill or

33

using the knowledge, training, and experience gained from the franchisor to compete against it. *Keller Corp. v. Kelley*, 187 P.3d 1133, 1138 (Colo. App. 2008).

The Bar Method has a legitimate business interest in protecting itself and its franchisees from unfairly competing with the Henderson Defendants and Bravence. The entire Bar Method® System depends on The Bar Method developing new strategies, technologies, program offerings, exercise techniques and choreographies, promotions, and marketing campaigns to increase membership and limit member attrition. The entire system relies upon The Bar Method to continue evolving in the ever-changing fitness landscape to stay abreast of the competition, and this is particularly true in the midst of the pandemic with a franchise system of small business owners hit particularly hard by forced studio closures and ongoing public health concerns. If a competitor has access to, and is permitted to use, The Bar Method's proprietary information, as Defendants are plainly doing, it will be used against The Bar Method to divert members to Henderson's new competitive fitness center less than two miles from the Cherry Creek Studio in an identical target market.[4]

### 4. The Post-Term Covenant Not to Compete is Reasonable in Scope.

A noncompete that is statutorily permitted under Colorado law, like the present one, is enforceable if it is reasonable in duration and geographic scope. *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006); *National Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo. App. 1984). To be reasonable, a noncompete agreement must not be broader than necessary to protect the promisee's legitimate interests, and it must not impose hardship on the promisor. *See Whittenberg v. Williams*, 110 Colo. 418, 135 P.2d 228 (1943).

---

[4]   Henderson admitted she desired the location of the Bravence studio because it would allow her to retain her client base. Compl., Ex. 3.

It is well established under Colorado law that covenants not to compete "for terms up to five years and within distances of 100 miles" are commonly upheld. *Harrison v. Albright*, 40 Colo. App. 227, 231, 577 P.2d 302, 305 (1977); *see also Core Progression Franchise,* 2021 WL 1222768, at * 7 (one-year, 25-mile noncompete restriction reasonable). The two-year, five-mile post-term restriction on competition effective upon expiration or termination of the Franchise Agreement in this case is well within the parameters of reasonableness. *See also* Tegt Decl., Ex. 3, Order in *The Bar Method Franchising, LLC v. AJ Bar, Inc.*, No. 3:20-cv-14454-FLW-LHG (D.N.J. Feb. 4, 2021) (Chief Judge of the United States District Court for the District of New Jersey finding The Bar Method is likely to prevail on the merits of enforcing the confidentiality provisions and five-mile post-term covenant not to compete in similar franchise agreement).

The Court should find the Henderson Defendants' covenants not to compete reasonable and enforceable. The two-year, five-mile post-term restrictions are reasonably tailored to prohibit the Henderson Defendants from providing important proprietary information to Bravence to operate a competitive fitness center with the same geographic reach of The Bar Method's existing client base and offering similar barre and other studio-based fitness programming, which is exactly what Bravence is doing now.

The covenant not to compete also protects the other neighboring Denver Bar Method® franchisee who is located about six miles from the Cherry Creek Studio and from Bravence. If the Henderson Defendants covenant not to compete is not enforced, the other local franchisee will have to continue compete with someone who has had access to The Bar Method® System, methods, procedures and trade secrets for years and who is openly advertising that its instructors are "certified" to teach the same classes as those offered by the Denver Bar Method® franchisee. The neighboring studio will also have to compete by offering barre fitness programming to their

students while Henderson and Bravence utilize the same techniques they obtained through months of training by The Bar Method to poach clientele. The Bar Method therefore respectfully requests this Court determine that The Bar Method is likely to prevail on the merits of its claim against the Henderson Defendants for breach of their covenants not to compete.

5. *The Limitation on Involvement in Any "Competitive Business" is Reasonable.*

Last, the Franchise Agreement's restriction on competitive activities prohibiting the Henderson Defendants from engaging any capacity in a "Competitive Business," defined as any "gymnasium, an athletic or fitness center, a health club, an exercise or aerobics studio, or one or more similar facilities or businesses offering barre-based or other fitness-based instruction" is reasonable. *See* Compl., Ex. 1 (Franchise Agreement) §§ 12, 16.D. This Court has already determined a fitness franchisor's similar noncompete restrictions prohibiting former franchisees from being involved in any other "fitness studio" was enforceable to protect the franchisor's legitimate business interests of protecting its confidential information and goodwill. *Fitness Together Franchise*, 2020 WL 6119470, at *1, 10; *see also Core Progression Franchise*, 2021 WL 1222768, *1, 7 (fitness center franchisor likely to prevail on the merits of enforcing restrictive covenant prohibiting involvement in any "competing business").

Other courts have reached similar conclusions, finding that restricting a franchisee from involvement in another "fitness business" or a "competitive business" is a reasonable restraint to protect the franchisor's legitimate business interests. *See, e.g., Accelerations Prods., Inc. v. Arikota Inc.*, No. 2:14–CV–00252, 2014 WL 3900875, *1–2 (D. Utah Aug. 11, 2014) (non-compete prohibiting franchisee from owning, operating, leasing, franchising, engaging in, being connected with, having any interest in, or assisting any person or entity in any "sports training or health fitness business" reasonable); *Fitness Together Franchise Corp. v. C.P. Body Design, Inc.*, No 09–02230–

36

MHM, 2010 WL 11628010, *10 (D. Ariz. Feb. 24, 2010) (enforcing a fitness franchisor's restrictive covenants prohibiting franchisee from operating a "competitive business" is "critical to the vindication" of the franchisor's protectable interest in its customer relationships, revenue from those customers, and the maintenance of its confidential information). Likewise, the New Jersey federal court determined The Bar Method was likely to prevail on the merits enforcing a restrictive covenant prohibiting the former franchisees' involvement in any "fitness or exercise business." Tegt Decl., Ex. 3 at ¶¶ 4, 15.

Restricting the Henderson Defendants from ownership or involvement in any businesses defined as a "Competitive Business" is a reasonable restraint. Indeed, the application of this contractual restriction is the only way to now protect The Bar Method and The Bar Method® System from Bravence's in-studio and online offerings, particularly now that Bravence has opened its doors and obtained a significant client base by misappropriating The Bar Method's Confidential Information and trade secrets.[5] This factor weighs in favor of granting The Bar Method the relief it seeks.

### 6.     The Confidentiality Covenants are Equally Enforceable.

The Bar Method is also likely to prevail on the merits of its claim for enforcing the confidentiality covenants against the Henderson Defendants and prohibiting Bravence from using the information that was unlawfully obtained. This analysis is not impacted by the Court's determination on The Bar Method's fraud claim seeking rescission of the Settlement Agreement, because regardless of whether the Settlement Agreement is rescinded or not, Defendants agreed in

---

[5]   The Bar Method has asserted an alternative claim for breach of the covenant not to compete in the Settlement Agreement. If the Court declines to determine the Bar Method is likely to prevail in obtaining rescission of the Settlement Agreement, then this covenant should be enforced at this stage in the proceedings.

the Settlement Agreement that they remained bound by confidentiality provisions in Sections 11 and 16 of the Franchise Agreement and that those provisions survived the termination of the Franchise Agreement. *See* Compl., Ex. 14, ¶ 2.

Courts have granted franchisors injunctive relief to enforce similar provisions. *See, e.g.*, *Fitness Together*, 2020 WL 6119470, at *10; *Core Progression Franchise,* 2021 WL 1222768, at *9 (finding that franchisor was likely to prevail on the merits of its breach of contract claim for the franchisees' failure to return the confidential owners' manual as required by the franchise agreement). The Bar Method's confidentiality provisions have also been determined to be enforceable by another federal court. Tegt Decl., Ex. 3. In *The Bar Method Franchising, LLC v. AJ Bar Inc.,* the Chief Judge of the United States District Court for the District of New Jersey determined The Bar Method was likely to prevail on the merits of enforcing the Franchise Agreement's confidentiality provisions and the five-mile post-term covenant not to compete. *Id.* at ¶ 16.

Consistent with these holdings, there is no reasonable basis to interpret The Bar Method's Confidential Information, including its methods of barre instruction and client information, as something that should be used by the Henderson Defendants to build their new barre business. The terms of the Franchise Agreement make it clear that this information belongs to The Bar Method and that Defendants have no right to use this information to operate Bravence. "Confidential Information" includes The Bar Method's "methods, techniques and processes for teaching" and also "Client Information." Compl., Ex. 1, § 11.A (2, 6). The Henderson Defendants acknowledged and agreed that the Confidential Information, including Client Information, is proprietary and not to use "any Confidential Information in any other business or capacity, whether during or after the Term." *Id.*, § 11.A.

38

There is no question that Defendants have used The Bar Method's Confidential Information in breach of the Franchise Agreement. Bravence is teaching barre classes that use the exact "methods, techniques and processes for teaching" that the Henderson Defendants agreed they would keep confidential and not use outside the franchise relationship. One need only compare The Bar Method's techniques and methods of instruction with the "signature" classes offered by Bravence to see Defendants' breaches of their confidentiality obligations. *See* Compl., ¶ 80. Defendants' advertisements that its instructors rely on intensive training and certifications, all of which were obtained from The Bar Method's proprietary teacher certification programs, further evidences this theft of Confidential Information. Compl., Exs. 16-17. And, Defendants' touting that Bravence opened its doors to a member base of 150 members leads no question that Defendants have misappropriated the names, contract information and other personal information of the Cherry Creek Studio. *Id.*, ¶ 82. The Bar Method will prevail on the merits on its claim for breach of the Henderson Defendants' obligations of confidentiality.

### C.    The Bar Method is Likely to Succeed on the Merits of its Misappropriation of Trade Secrets Claim.

Under the Colorado Uniform Trade Secret Act ("CUTSA") and the federal Defend Trade Secrets Act ("DTSA"), trade secret misappropriation occurs when a person discloses or uses another's trade secrets obtained by improper means, including through a breach of a duty to maintain their secrecy. 18 U.S.C. § 1839 (5)-(6); C.R.S. § 7-74-102(1)-(2); *see also Mineral Deposits Ltd. v. Zigan*, 733 P.2d 606, 608 (Colo. App. 1988). It is well established under federal and Colorado law that confidential and proprietary client list and data can constitute trade secrets. *MSC Safety Solutions, LLC v. Trivent Safety Consulting, LLC*, No. 19-cv-00938-MEH, 2019 WL 5189004, at *7 (D. Colo. Oct. 15, 2019); *Hertz v. Luzenac Grp.*, 576 F3d 1103, 1114 (10th Cir. 2009). A fitness franchisor's exercise training methodologies, sales training, client customer

retention strategies and its confidential operations manual are also trade secrets under the applicable law. *Core Progression Franchise,* 2021 WL 1222768, at *9; *see also, e.g., Get In Shape Franchise, Inc. v. TFL Fishers, LLC,* 167 F. Supp. 3d 173, 119 (D. Mass. 2016) (confidential information about operating a small group fitness studio is the franchisor's trade secret under Massachusetts law); *You Fit, Inc. v. Pleasanton Fitness, LLC,* No. 8:12-CV-1917-T-27EAJ, 2012 WL 705983, at *3 (M.D. Fla. Oct. 31, 2012) (fitness franchisor established likelihood of success on the merits under Florida law in providing its methods, exercise techniques, standards, policies, procedures, and information relating to the development, operation and franchising of YouFit facilities warranted trademark protection), *report and recommendation adopted,* 2013 WL 521784 (M.D. Fla. Feb. 11, 2013).

In *Core Progression Franchise*, the Court found that another fitness franchisor was likely to succeed on the merits of protecting its trade secrets and granted the franchisor's motion for a preliminary injunction. 2021 WL 1222768, at *9. The franchisor argued that its methodology of training, sales training, client customer retention training, pre-opening marketing training, and other information contained within the Core Progression operation manual containing almost 14 years' of the franchisor's industry knowledge, trade secrets, and proprietary information which allows the Core Progression franchise model to be successful were protectable trade secrets and the Court agreed. *Id.* Likewise, in *Fitness Together,* the Court granted another fitness franchisor's motion for a preliminary injunction to protect the franchisor's alleged trade secrets comprised of client lists and nutrition guides, holding that even if all of the information did not qualify as a protected trade secret under Colorado law, the parties had nonetheless contractually agreed that the franchisees could not use the information outside of the scope of the franchise relationship. 2020 WL 6119470, at *10.

40

The Bar Method's trade secrets include its extensive four- to six-month teacher training program, its proprietary methods of instructor certification requiring hours of course work, its exercise sequencing and choreography, customer lists, marketing techniques and customer retention strategies in the highly competitive boutique fitness studio industry. These trade secrets are used throughout The Bar Method® System and The Bar Method has taken reasonable measures to keep its trade secrets confidential within the franchise system. For example, The Bar Method requires each franchisee to execute a franchise agreement that protects the secrecy of The Bar Method's trade secrets. See Compl., Ex. 1, §§ 11.A, 16.C. Owners of the franchisee entity are also obligated to personally guaranty these obligations. *Id.*, Ex. 1, Ex. C (the Guaranty). The Bar Method authorizes franchisees to use its trade secret information only as allowed by the franchise agreement and requires franchisees to obtain noncompetition or confidentiality agreements from all teachers and other employees having access to The Bar Method's trade secrets, which are only available only through a password protected intranet site. *Id.* § 11.A(d). The Bar Method further requires that franchisees agree not make any unauthorized disclosure of The Bar Method's trade secrets. *Id.* § 11.A. The Bar Method also takes steps to ensure that The Bar Method® franchisees return the trade secrets and confidential information upon termination or expiration of the Franchise Agreement. *See id.* § 16.C.

The Henderson Defendants have disclosed a variety of The Bar Method's trade secrets to Bravence and are openly advertising their theft of The Bar Method's confidential Client Information and its teacher training techniques. Included in these trade secrets is the confidential names, contact and billing information of customers of the Cherry Creek Studio, which Defendants have already used to solicit over 150 members to Bravence and to convince members of The Bar Method that their studio is just "moving." Defendants have shown they have no regard for The Bar

41

Method's Confidential Information and the potential for continued misuse of The Bar Method's proprietary methods of class instruction and studio operation is readily apparent. The Henderson Defendants acknowledged in the Franchise Agreement (and the Settlement Agreement) they would not use this information, or any other Confidential Information, for any other purpose but are now using this information to unfairly compete. Compl., Ex.1 at § 11.A, Ex. 14, ¶ 2. The elements for a claim for trade secret misappropriation under the DTSA and CUTSA are satisfied. The Bar Method is likely to succeed on these claims and this factor weighs in favor of preliminary injunctive relief.

## III. ANY HARM DEFENDANTS WILL SUFFER IF A PRELIMINARY INJUNCTION IS ISSUED IS COMPARATIVELY SLIGHT AND WAS CAUSED BY THEIR OWN ACTIONS.

Compared with the irreparable harm to The Bar Method's goodwill and System, any harm suffered by Defendants when a temporary restraining order or preliminary injunction issues will be slight and will be the result of their own doing. Such self-inflicted harm is insufficient to warrant denial of a motion for injunctive relief. *Core Progression Franchise,* 2021 WL 1222768, at *10 (any harm to the defendant "may be discounted by the fact that the defendant brought that injury upon itself.") (citation omitted); *Bad Ass Coffee,* 636 F. Supp. 2d at 1251 ("Courts balancing harms to former franchisees who violated non-compete agreements have similarly been unwilling to allow defendants to point to harms that they could have avoided by abiding by their contract."); *Edinburgh Fitness*, 2014 WL 1415081 at *8 ("Defendants signed a [franchise a]greement and cannot now opt out of it. Any harm suffered is of their own making.").

The Henderson Defendants' decision to operate a competing barre business built on The Bar Method's Confidential Information is entirely their own fault, particularly after Defendants misled The Bar Method into dismissing the Minnesota Lawsuit intended to prevent Bravence from unlawfully competing with The Bar Method on its opening day. The Bar Method was willing to

42

work with Defendants to allow them to continue their involvement with Bravence and allow them to offer other non-barre studio fitness classes like yoga or bootcamp style classes, but that was not good enough for Defendants who instead elected to dupe The Bar Method into entering the Settlement Agreement having no intention to ever abide by its terms. The result is Bravence opened its doors with a client base of 150 members obtained through Defendants' theft of The Bar Method's clients and proprietary methods of operating a boutique barre fitness business. The balance of harms tips strongly in favor of The Bar Method.

In addition, enforcing the restrictive covenants does not place undue harm on Defendants, who will only be restricted from owning, operating, or being employed by a fitness center or similar facility within a five-mile radius from the Cherry Creek Studio or any other Bar Method® studio for a period of two years, leaving many opportunities for Henderson to own or operate a fitness facility outside of the five-mile radius or to continue operating Bravence with the other "wellness collective" services advertised, such as acupuncture and massage This factor weighs in favor of issuing injunctive relief.

## IV.    INJUNCTIVE RELIEF IS NOT ADVERSE TO THE PUBLIC INTEREST.

A preliminary injunction will not be adverse to the public interest. As this Court has previously noted, "[i]n granting preliminary injunctions, other judges in this District have concluded that the fact that Colorado statutes permit such noncompete agreements demonstrates that enforcing one would not be against the public interest." *Core Progression Franchise,* 2021 WL 1222768, at *10 (citing *Fitness Together,* 2020 WL 6119470, at *11 and *Panorama Consulting Solutions, LLC v. Armitage,* No. 17-cv-01400-RM, 2017 WL 11547493, at *4 (D. Colo. June 9, 2017) (finding it is in the public interest for laws to be obeyed and contracts to be observed)). This factor also weighs in favor of the requested relief.

## V.      INJUNCTIVE RELIEF WILL PRESERVE THE STATUS QUO.

A temporary restraining order is issued to maintain the status quo pending a decision on the merits. *Four Pin v. Orsinger Advert. Co.*, 669 P.2d 1053, 1054 (Colo. App. 1983). The status quo means the "last peaceable position" existing between the parties before the dispute developed. *Dry Cleaning To-Your-Door, Inc*, 2007 WL 4557832, at *2. Here, the last peaceable position was the world as it existed before Defendants began violating the Settlement Agreement and the Franchise Agreement by unlawfully competing with The Bar Method and using its stolen trade secrets. An injunction barring this conduct preserves the status quo and immediately prevents the harm caused by Defendants from compounding. *See, id.* (last peaceable status was when defendant was "bound by the non-compete provision[;] . . . an injunction prohibiting competition would [maintain] the status quo."); *DoubleClick Inc.,* 402 F. Supp. 2d at 1256 (Murphy, J. concurring) (same); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring) (requiring a party who disturbed the status quo to reverse its actions, "restores, rather than disturbs, the status quo.").

## VI.     THE BAR METHOD SHOULD NOT BE REQUIRED TO POST A BOND.

Rule 65(c) references "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court may, in its exercise of discretion, determine a bond is unnecessary to secure an injunction "if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987).

For the reasons discussed above, Defendants will not suffer any undue harm if the requested relief is granted since injunctive relief will preserve the status quo. An injunction barring Defendants from misappropriating The Bar Method's trade secrets and from unlawfully operating a fitness business within the five-mile noncompete radius does not affect Defendants' future, or

44

present and lawful, business prospects and interests. This includes Defendants' right to provide barre instruction outside of the noncompete radius without misusing The Bar Method's confidential information. Accordingly, no bond should be required.

## VII.    THE BAR METHOD SHOULD BE AWARDED ITS ATTORNEYS' FEES AND COSTS.

Section 18.C of the Franchise Agreement permits the recovery of attorneys' fees and costs by The Bar Method to enforce compliance with the Franchise Agreement, including successfully obtaining injunctive relief to enforce its covenants not to compete. Compl., Ex. 1, § 18.C. If the Court determines it cannot reach a decision on whether The Bar Method is likely to prevail on its claim seeking rescission of the Settlement Agreement, then Paragraph 7(e) of the Settlement Agreement also provides for an award of attorneys' fees and costs in successfully enforcing the covenants in the Settlement Agreement. Compl., Ex. 14, ¶ 7(e).

"Contractual fee-shifting provisions are generally valid under Colorado law," and "a fee-shifting provision need not be mutual to be enforceable." *Klein v. Tiburon Dev. LLC*, 405 P.3d 470, 475 (Colo. App. 2017) (citing *Morris v. Belfor USA Grp.*, Inc., 201 P.3d 1253, 1260 (Colo. App. 2008)). "[A] fee-shifting provision, like any contractual provision, may not be enforced as written if doing so would violate public policy." *Id.* So a court imposes a "reasonableness" requirement as a matter of public policy where there is a "starkly absolute" fee-shifting provision. *Id.* But a prevailing party fee-shifting provision is not as "starkly absolute" and does not void public policy, so reasonable attorneys' fees may justly be awarded. *Id.*; *see also S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein, M.D.*, 343 P.3d1044, 1049 (Colo. App. 2014).

The attorneys' fees provision in section 18.C of the Franchise Agreement is a unilateral prevailing party fee award that does not violate public policy. The mutual attorneys' fees provision

45

3635283.1

in the Settlement Agreement likewise does not violate public policy. Courts enforce these provisions at the preliminary injunction stage to allow franchisors to recoup expenses incurred in enforcing their franchise agreements. *See, e.g., Prop. Mgmt. Bus. Sols. v. Averitte*, No. 2:18-CV-552, 2018 WL 4327922, at *10 (D. Utah Sept. 10, 2018); *Edinburgh Fitness LLC,* 2014 WL 1415081, at *7. Upon granting this request for a temporary restraining order and preliminary injunction, The Bar Method respectfully requests this Court award The Bar Method its reasonable attorneys' fees and costs to be supported by an affidavit filed in accordance with Local Rule 54.3.

## CONCLUSION

Defendants' actions have already imposed immeasurable harm to The Bar Method's goodwill and entire franchise system. The Bar Method therefore respectfully requests this Court grant a temporary restraining order and preliminary injunction to stop that harm from compounding.  A proposed Order is attached for the Court's convenience.

Dated: December 14, 2021          /s/ *Kelley B. Duke*
                                  Kelley B. Duke, Atty. Reg. #35168
                                  Ireland Stapleton Pryor & Pascoe, PC
                                  717 17th Street, Suite 2800
                                  Denver, Colorado 80202
                                  (303) 623-2700
                                  *kduke@irelandstapleton.com*

3635283.1

Dated: December 14, 2021         /s/ *Susan E. Tegt*
                                Susan E. Tegt, Esquire (MN 0387976)
                                Larkin Hoffman Daly & Lindgren Ltd.
                                8300 Norman Center Drive
                                Suite 1000
                                Minneapolis, Minnesota 55437-1060
                                (952) 835-3800
                                *stegt@larkinhoffman.com*

                                *Attorneys for Plaintiff The Bar Method Franchisor, LLC*