## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-03357-RMR

**THE BAR METHOD FRANCHISOR, LLC,** a Delaware limited liability company,

                Plaintiff,

v.

**HENDERHISER LLC**, a Colorado limited liability company; **BRAVENCE WELLNESS COLLECTIVE LLC**, a Colorado limited liability company, and **LAURA E. HENDERSON**, an individual,

                Defendants.

---

## RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Defendants Henderhiser LLC; Bravence Wellness Collective, and Laura E. Henderson, through counsel, submit this Response to Docket #2, Plaintiff The Bar Method Franchisor, LLC's ("TBM") Motion for a Temporary Restraining Order and a Preliminary Injunction filed December 12, 2021, and Docket #23 Plaintiff's Supplemental Memorandum in Support of Motion for a Temporary Restraining Order and Preliminary Injunction filed on December 30, 2021.

## I.  PRELIMINARY MATTERS

### A.  Defendants seek an order declaring the exclusive jurisdiction of Colorado courts.

As a preliminary matter Defendants request that the court take notice that TBM has filed an Arbitration case seeking damages against Defendants concerning this same subject matter and underlying facts. Motion for TRO pg. 10 fn1. The Settlement Agreement places jurisdiction exclusively in Arapahoe County, Colorado. Settlement Agreement § 7(b)

1

attached at Compl., Ex. 14 ("Any breach shall be exclusively venued in Arapahoe County Colorado. All parties waive any objection to the jurisdiction or venue of such court."). "Forum selection provisions are prima facie valid' and a party resisting enforcement carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances." *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 957 (10th Cir. 1992). TBM does not claim that the forum selection clause itself was procured by fraud. Therefore, jurisdiction is only appropriate in Arapahoe County (or this Federal Court due to the Federal trade secrets claim), and any arbitrator lacks jurisdiction. Defendants seek an order declaring that the courts of Colorado have exclusive jurisdiction in this matter unless and until the Settlement Agreement is rescinded by a Court of competent jurisdiction. As a matter of efficiency Defendants raise the issue here; however, if this Court prefers separate or supplemental briefing on this matter Defendants will follow the Court's preference and direction.

### B. Defendants and their counsel have operated in good faith.

TBM's Motion accuses Defendants and their counsel (including undersigned) of serious misbehavior in strident terms. Undersigned is compelled to briefly respond that such accusations are unwarranted – and that Defendants and their counsel have acted in good faith and with professionalism throughout this matter. With that said, this Response will refocus on the facts, law, and legal arguments this Court must consider to make a decision.

### II.  INTRODUCTION

Laura Henderson, through Henderhiser LLC, operated a Bar Method studio pursuant to a Franchise Agreement with TBM in the Cherry Creek area of Denver, Colorado for six years (the "Cherry Creek Studio").  Her Franchise Agreement expired the same day as her business lease, on November 30, 2021.  *See* Henderson Affidavit ¶ 7, Mtn., Ex. A-2 (hereinafter "Henderson Afft.").  Five years ago, Colorado's flagship medical school,

UCHealth, purchased the building intending to devote it exclusively to medical services. Indeed, in 2017 Ms. Henderson and Henderhiser LLC prevailed in litigation with UCHealth over the Cherry Creek Studio's right to stay in the current location through the natural termination of the lease. Although victorious, that lawsuit made clear to all involved, including TBM, that there was no opportunity to continue in the current studio location past November 30, 2021. So, January 19, 2020, Ms. Henderson began working with TBM's real estate agent to locate alternative studio space that would allow her to renew her Franchise Agreement within her Cherry Creek franchise area. *Id.* TBM utilizes a proprietary system to evaluate site selection. Franchise Agmt § 11.A(1), Compl. Ex. 1. No suitable space acceptable to TBM could be found. In fact, in 2021 when Ms. Henderson found the alternative potential Glendale location at issue in this lawsuit, she first took it to TBM and proposed it as an option to extend her Franchise Agreement. TBM rejected the location because it required additional fitness tenants that did not fit TBM's business model and would require shared bathrooms.[1] *Id.* Without an option to continue her Cherry Creek Studio as a franchisee, Ms. Henderson began preparing for a career apart from Bar Method after November 30, 2021.

Having devoted six years developing general skills and talents as a fitness business owner and without an opportunity to continue her franchise, Ms. Henderson was stuck. To utilize her marketable skills in fitness and wellness to earn a living, Ms. Henderson first offered to clarify her noncompete and reach a mutual agreement with TBM that she would not teach barre classes or allow them to be taught at her planned wellness collective. May 2021 email Henderson/Schoen, Compl. Ex. 3. TBM refused this offer, insisting that under Colorado law it could prevent her from working in any wellness or fitness environment within five miles of either its sole remaining Stapleton location or the to be abandoned

---

[1] Interestingly, the current Cherry Creek Studio location shares bathrooms with an Urgent Care medical facility.

Cherry Creek location per the terms of her noncompete. Ms. Henderson determined this was not enforceable under Colorado law. So, she moved forward with plans to make a living with her fitness and wellness skills.  She formed Bravence Wellness Collective LLC, and set out to try to build a business TBM expressly acknowledged was different from TBM in Glendale, opening after her Franchise Agreement expired on November 30, 2021.

To do so, Ms. Henderson went back to the space TBM rejected and entered a lease to open a wellness collective in Glendale, Colorado.  The wellness collective intends to offer services through independent contractors such as massage, acupuncture, medispa services, fitness classes, along with offering a nutrition bar and a bar that serves alcohol.  Most services would be provided through independent contractors working cooperatively through the collective.  This is a radically different business model than the single modality of barre classes offered by TBM.  Moreover, Bravence Wellness Collective was scheduled to open December 1, 2021, after her Franchise Agreement expired, the Cherry Creek Studio closed and TBM abandoned Cherry Creek, meaning Bravence would not be operating at its opening within 5 miles of any currently operating or under construction Bar Method studio. Henderson Afft. At ¶ 8, Mtn. Ex. A-2.

During the summer, Ms. Henderson obtained the services of fitness professionals from other disciplines to develop a fitness technique for Bravence incorporating functional training. Her team consulted a spine surgeon, physical therapist, and OB/GYN to assess the program's safeness and effectiveness and recommend adjustments. The resulting manual is over two hundred pages. Three months from the expiration of her Franchise Agreement, Ms. Henderson began creating social media platforms and advertising to build interest ahead of opening.  Ms. Henderson never utilized any mailing lists or contact information held by her Cherry Creek Studio or TBM to advertise the new wellness collective to Bar Method clients. Ms. Henderson did not repurpose or change any social media platforms of the Cherry Creek

Studio to Bravence Wellness Collective sites—rather she set up brand new social media for Bravence Wellness Collective. *Id.* at ¶ 14. She shared her plans with friends—who at times were also clients—and directed them to Bravence Wellness Collective's social media platforms when they asked to see them. *Id.* And some of those friends invited their friends, some of whom were also members of the Cherry Creek Studio. When Cherry Creek Studio members asked about her plans following the closure of her franchise, she directed them to fill out a separate contact sheet apart from TBM's client list if they wanted additional information on her plans for Bravence. She also referred clients who wished to continue TBM's particular system to other TBM studios. *Id.* at ¶ 13.

In early October 2021, TBM filed a complaint and preliminary injunction motion in Minnesota State Court seeking to stop Bravence from opening its doors and offering fitness of any kind in Glendale. The parties agreed on material settlement terms on or about November 16, 2021, a few days after Defendants filed their Opposition to Preliminary Injunction that set forth the applicable Colorado law on noncompete provisions. TBM and Defendants spend the next two and a half weeks carefully negotiating specific settlement terms resulting in the Settlement Agreement executed December 2, 2021, effective December 1, 2021 to match the expiration of the Franchise Agreement. The Settlement Agreement replaced the Franchise Agreement's Noncompete Provision which was unenforceable in Colorado, with a noncompete that was narrower in scope.[2] Settlement Agreement § 3 attached at Compl., Ex. 14. The new noncompete, instead of prohibiting activity in any competitive business, forbids Henderson from teaching "barre classes" as defined in the noncompete. *Id.* The "barre classes" definition is substantially similar to the definition Ms. Henderson offered in her November 10 affidavit submitted in the litigation. Henderson Afft.,

---

[2] Undersigned counsel believes that certain aspects of the Settlement Agreement noncompete, such as tying a noncompete territory to a former site where the party seeking enforcement is not operating, is still overbroad and unenforceable under Colorado law.

Mtn. Ex. A-2. The definition of "barre classes" was integral to Defendants signing the deal, because it gave them a firm legal definition of what was prohibited to teach that did not conflict with the functional exercise program Ms. Henderson had spent substantial resources developing. It also avoided the problem of conflating "barre classes" as defined in the Settlement Agreement, with barre as a broader undefined category of activities using a ballet bar.

The Settlement Agreement also contains a merger clause, a clause stating the Agreement had been reviewed by counsel, and a venue/jurisdiction clause replacing the arbitration clause in the Franchise Agreement. Settlement Agreement §§ 7(g), 7(a), 7(b), 4 attached at Compl., Ex. 14. The Settlement Agreement provides for liquidated damages of $1,500 dollars for misappropriation of client data, and a prevailing party attorney fees provision replacing the unilateral provision in the Franchise Agreement. *Id.* at § 4.

During negotiations Bravence openly advertised the new business while negotiating with TBM. TBM had every chance to view the classes offered by Defendants before signing the Settlement Agreement on December 2nd. On December 1st, before the Settlement Agreement was executed, Defendants contacted TBM to remove their access to any client lists and client information. Defendants have not had such information since the day prior to execution.

Four days after signing the agreement TBM decided it wanted to rescind and began this current action seeking a preliminary injunction based on its claims of Fraud, violation of the Franchise Agreement, and misappropriation of Trade Secrets. Mtn. p. 26. These claims lack support in law, and are insufficient to meet the high standard required for a preliminary injunction.

### III.  LEGAL ARGUMENT

"Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kansas v. Andersen,* 882 F.3d 1205, 1223 (10th Cir. 2018). *Aposhian v. Barr,* 958 F.3d 969, 978 (10th Cir. 2020) ("A preliminary injunction is an extraordinary remedy, the exception rather than the rule.") The purpose of a preliminary injunction is to preserve the status of the parties until a trial on the merits can be held. Schrier v. Univ. Of Co., 427 F.3d 1253, 1258 (10th Cir. 2005). (citing *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L.Ed.2d 175 (1981). "An injunction is generally a preventive and protective remedy, aimed at future acts; it is not intended to redress past wrongs." *Snyder v. Sullivan*, 705 P.2d 510, 513 (Colo. 1985). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting, *Schrier*, 427 F.3d at 1267.)

Three types of preliminary injunctions are disfavored even more, those that: 1) alter the status quo; (2) mandate action instead of prohibiting it; and (3) grant all the relief that a movant could receive after a trial on the merits. *Id*. at 1259. While all preliminary injunctions are extraordinary, disfavored injunctions require even closer scrutiny.  *Id.*  TBM's Motion seeks a disfavored injunction under either type 1 or type 3. As a result, TBM must meet a "heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019).

To determine the status quo, Courts look to the "last peaceable uncontested status between the parties before the dispute developed." *Schrier v. Univ. of CO* 427 F.3d 1253, 1260 (10th Cir. 2005). Here this dispute developed after the parties signed the Settlement Agreement, which was the last peaceable uncontested status between them. Therefore, Rescission would alter the status quo and requires close scrutiny.

To obtain a preliminary injunction the movant must establish: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant of the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Aposhian v. Barr,* 958 F.3d at 978 (quoting *Gen Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1226 (10th Cir. 2007)). It is the movant's burden to establish that each of these factors tips in his or her favor. *Heideman v. S. Salt Lake City,* 348 F3d. 1182, 1188-89 (10th Cir. 2003). TBM fails to establish any of these criterion.

**A.  TBM's claims are likely to fail on the merits.**

TBM premises its Preliminary Injunction Motion on: (1) establishing fraudulent inducement to allow recission of the Settlement Agreement (Motion II.A. pp. 26-30); (2) establishing breach of the Franchise Agreement's noncompete and nondisclosure clauses (Motion II.B. pp. 31-39); establishing its misappropriation of trade secrets claim under Colorado or Federal law (Motion II.C. pp. 39-42. TBM cannot show a substantial likelihood of success that it will prevail on any of these claims. Indeed, if its fraud claim fails, then its attempt to enforce the Franchise Agreement noncompete fails as a matter of law because the Settlement Agreement noncompete supercedes the Franchise Agreement. What is more, TBM presents no evidence of any misappropriation of a trade secret or confidential information.

**1.  TBM's claim of fraud and effort to rescind the negotiated Settlement Agreement is likely to fail.**

TBM's fraud claim is a nonstarter because fraud claims cannot be based on the non-performance of a promise or contractual obligation. *State Bank of Wiley v. States*, 723 P.2d 159, 160 (Colo. App. 1986). TBM proposes multiple theories to support fraudulent inducement or fraudulent concealment leading a national franchise to enter the Settlement Agreement. Initially, TBM argued the fraud was Defendants' purported intention to dishonor the Settlement Agreement. Such a theory is precluded by *State Bank of Wiley*. More recently,

TBM supplemented its Motion to allege that Defendants either fraudulently induced TBM into agreeing to Settlement by misrepresenting a lease extension at the 311 Steele Street location in Cherry Creek, or fraudulently concealing the same extension.  Supp. Memo. p. 6 ("Defendants either knew the misrepresentations were false…or Defendants knew they were making a material omission…" Supp. Memo. p. 6.) The elements of Concealment and Misrepresentation are counterfactual. So it is unusual to simultaneously plead concealment and misrepresentation on the same fact. At bottom, all of TBM's fraud theories focus the alleged act of fraud on the Settlement Agreement itself. Mtn. pp. 19-20 ("Defendants therefore fraudulently induced [TBM] to dismiss the Minnesota lawsuit… in reliance that [Defendants] would comply with the terms of the Settlement Agreement").

### 2.  TBM reliance on Trimble is misplaced.

To get past *State Bank of Wiley* TBM cites *Trimble v. City & Cty. of Denver*, 697 P.2d 716 (Colo. 1985), to support its fraud claim. TBM's reliance on *Trimble* is misplaced. *Trimble*'s initial proposition is that "[public] policy favors settlements of disputes, provided the settlements are fairly reached." *Id.* (citing *Davis v. Flatiron Materials Co.*, 182 Colo. 65, 511 P.2d 28 (1973)). The Court in *Trimble* addressed an unfairly reached settlement of a Denver city hospital employment grievance under Denver's career service rules and it is unclear if attorneys negotiated or reviewed the settlement. 697 P.2d at 720-21. The trial court found a pattern of fraud by Mr. Trimble's supervisor including intentional and reckless disregard for career service rules and expressly admitted intentions by the supervisor to dishonor terms of the Settlement Agreement. Id. at 721-22. Importantly, even then, the Court did not rescind the Settlement Agreement because it found Mr. Trimble had affirmed the Settlement Agreement. Id. at 723. As a result, any statements by the Court discussing the rescission of the settlement for fraud are dicta.

In contrast to *Trimble*, here, TBM has made no showing that the Settlement Agreement was unfairly reached. Both sides had skilled counsel advising them throughout the process to resolve active litigation. The Settlement Agreement was negotiated by counsel for weeks and contained a merger clause excluding extrinsic evidence.

Indeed, Colorado has distinguished *Trimble*'s exceptional circumstances from the general rule that Settlement Agreements are enforced, clarifying that absent a fiduciary or trust relationship settlement negotiations are adversarial with each party acting on its own behalf, and "each counsel [has] a duty to his or her client to protect the client's interests." *Poly Trucking, Inc. v. Concentra Health Servs., Inc*., 93 P.3d 561, 565 (Colo. App. 2004). In *Poly Trucking* the "undisclosed fact was the failure of the contract language adequately to protect [the Plaintiff's] interests." *Id*. That is the case here as well – TBM is unhappy that the long negotiated and key settlement provision defining "Barre classes" is not as broad as TBM would now prefer. So TBM is trying to put on Defendants the duty of explaining that definition and its meaning to TBM, and arguing it was relying on Defendants and their counsel to do so. This is unavailing because "whether the material fact at issue is characterized as litigation strategy, an intent to reserve the right to sue, or a contract omission…" there is no duty on an adversarial party or its counsel to disclose it. *Id*. The failure to review a settlement agreement adequately before signing it cannot be imputed to the adversarial party as fraudulent behavior. *Id*.

Here Defendants unequivocally intend to honor the Settlement Agreement and negotiated it precisely so they could conduct their planned business. Defendants want the Settlement Agreement enforced by its terms. Defendants relied on those terms in executing the Settlement Agreement. Therefore, they could not have intent to commit fraud.

### 3. Because the Settlement was reached fairly, TBM cannot use extrinsic evidence to point to the intent of the parties.

The Settlement Agreement contains a merger clause:

> This agreement sets forth the entire understanding between the parties relating to the subject matter contained herein, there being no terms conditions, warranties, or representations other than those contained in this Agreement. Settlement Agreement §7(g) attached at Compl., Ex. 14.

Merger clauses preclude the consideration of extrinsic evidence to ascertain the intent of the parties. *Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995). Merger clauses serve to allow parties to limit future contractual disputes to issues relating to the express provisions of the Contract. *Id*.

Here, TBM seeks to rescind a valid settlement agreement between sophisticated parties with able counsel, because, in hindsight, TBM wants to change the terms of the Settlement Agreement. Doing so would undermine the ability to openly negotiate and work through any settlement if every comment between counsel can unlock the four corners of a settlement agreement.

When sophisticated parties enter into agreements while represented by counsel it is improper to rewrite the agreement by looking to evidence outside the four corners of the settlement. *Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995). This is settled law nationwide. When adversaries with access to counsel settle litigation courts enforce their settlement. "Parties involved in litigation know that they are locked in combat with an adversary and thus have every reason to be skeptical of each other's claims and representations." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039 (9th Cir.) "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access…courts are disinclined to entertain claims of justifiable reliance." *Grumman v. Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2nd Cir. 1984).

TBM is a national franchise with 84 locations across the USA and Canada, and in-house attorneys. It also employs as outside counsel Larkin Hoffman, a sophisticated Minneapolis law firm with over 70 attorneys. TBM had its counsel advising and representing

its interests throughout negotiations and execution of the Settlement Agreement. TBM and its counsel had the expertise and duty to determine whether the Noncompete Clause including the definition of "Barre class", the Merger Clause, and the other Settlement Agreement terms appropriately protected TBM's interests. Indeed it included this in the Settlement Agreement at § 7(a):

> The Parties each acknowledge that they have read this Agreement, understand its terms, and have had the assistance and advice of counsel of their choosing in reviewing and negotiating this Agreement. Each of the parties represents and warrants that the party is competent and authorized to sign this Agreement, and that such party is fully aware of the contents and legal effect of this Agreement and the execution of this Agreement by the Party.

In short, TBM had a fair opportunity to represent its interests and was not relying on Defendants to do so.

### 4. TBM cannot establish fraud because it has not alleged a colorable false representation.

Assuming *arguendo*, the court could look beyond the four corners of the Settlement Agreement, TBM is still unlikely to be successful on a fraud claim. Fraudulent misrepresentation requires TBM to prove (1) a false misrepresentation of a material fact; (2) reliance on the misrepresentation; (3) that TBM was justified relying on the misrepresentation (4) and that TBM's reliance resulted in damages *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 53, 420 P.3d 223, 234. A "false representation" is defined as any words or conduct that creates an untrue or misleading impression of the actual past or present fact in the mind of another. *Id*. at ¶ 48. The misrepresentation must be of a "definite and specific character," TBM cannot rely on equivocal circumstances, conduct, or words that might be interpreted with innocence or good faith. *Id*.

Here, there is nothing definite and specific about the alleged misrepresentation. In fact, as best understood, TBM claims alternative theories of misrepresentation first in the

execution of the settlement, Mtn. p. 19, and second as amended by Defendant Henderson's statement that Bravence would operate in a different location than 311 Steele. Supp. Memo. p. 6. The first theory fails because a failure to perform contractual obligations is not fraud. *State Bank of Wiley Supra* at p. 8.

Second, Bravence's representations it would not continue at 311 Steele is not fraud because it is statement with an innocent good faith interpretation. *Rocky Mountain Expl., Inc.*, 2018 CO 54, ¶ 48. The lease for 311 Steele ended exactly when Defendant Henderson stated that it would. At that time, construction on Bravence's new location was not complete, in fact it is still ongoing. Due to unexpected circumstances, UCHealth could offer Bravence extra time at 311 Steele because its own construction plans were delayed. So, Bravence used that space for December 2021, and now is operating out of a temporary hotel location while it awaits completion of its permanent space. TBM in its own supplemental memorandum notes this innocent good faith interpretation, writing: "The Bar Method received a copy of an email newsletter from Bravence, informing clients that the transition to the new studio space was taking longer than planned" and Bravence would continue operating at 311 Steele "until further notice." Supp. Memo. p. 3.

Further, nothing in the Settlement Agreement prevents the extension of the lease, or the operation of a fitness business at the 311 Steele location. What the Settlement forbids is offering "Barre classes" as that term is defined in the Settlement Agreement § 3(a) within five miles of TBM or the 311 Steele site. Still, if TBM believes Defendants have breached the terms of the Settlement Agreement it can seek to recover under the Settlement Agreement.

### 5. TBM cannot show justifiable reliance to support fraud.

TBM cannot point to a specific and definite false misrepresentation by Defendants, but even if it could, TBM cannot show that it relied on any statement. It is fundamental that a false representation must be of a material fact and it "must be one necessarily influencing and

13

inducing the transaction and going to its very substance". *People ex rel. Metzger v. Watrous* 215 P.2d 344, 349 (Colo. 1950) (quoting *Wheeler v. Dunn* 13 Colo. 428, 22 P. 827, 833 (1889)). TBM points to three different and counterfactual possibilities for fraud. Supp. Memo. p. 6, Mtn. p.19. TBM has not shown that any of these, if true, induced it to enter the Settlement Agreement. In addressing this reliance element, it is worth noting that TBM was already seeking recission for Fraud prior to discovering the purported fraud. Supp. Pg.3. (purported misrepresentation discovered "after this lawsuit was filed.") Moreover, TBM repeatedly states that it was actively and frequently monitoring Defendants for compliance both during and after the Settlement Agreement, demonstrating that TBM was not simply relying on Defendants' execution but was concerned about compliance.

"It is long-settled law that if a party claiming fraud has access to information that was equally available to both parties and would have led to the true facts, that party has no right to rely on a false representation." *Vinton v. Virzi*, 2012 CO 10, ¶ 17, 269 P.3d 1242, 1247. Here TBM claims it discovered the purported fraud on December 6 and December 22, 2021. Mtn. p. 14; Supp. Memo. p. 3. But as TBM points out in its filings, TBM could have discovered this information on Nov. 30th, December 1st, or December 2nd – before entering the Settlement Agreement. TBM could access Bravence's website host and see classes were offered on December 1st. TBM continually monitored Bravence's social media beginning at least in September. Mtn. p. 11. By TBM's own account Defendants' actions were open and visible through the internet and public observation. The agreement was signed December 2nd, and TBM claims open and observable violations occurred December 1st. What Defendants were teaching and that they were doing so at 311 Steele Street was public knowledge well available to TBM before it signed the Settlement Agreement.

In addition to its monitoring and surveillance of Defendants, TBM has been guided by legal counsel while TBM has been engaged in discussions, litigation, and ultimately settlement negotiations with Defendants.

### 6.  TBM's Fraudulent Concealment theory is meritless without a duty to disclose.

In its Supplemental Motion TBM also claims Fraudulent Concealment. This claim fails as well. To succeed under this theory TBM would have to show (1) the concealment of a material existing fact that in equity and good conscience the defendant should have disclosed; (2) knowledge on the defendant's part that such a fact was being concealed; (3) ignorance of that fact on the plaintiff's part; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. TBM makes no attempt to show any of these. Furthermore, TBM must show that the Defendants had a duty to disclose the material information. *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234. TBM cannot show any duty to disclose, and any duty "would also interfere with attorneys' well-settled duties of loyalty and confidentiality to their clients." *Id.*; *Poly Trucking*, 93 P. 3d at 566.

### B.  TBM's claims under the Franchise Agreement fail if it cannot establish fraud and also because the Franchise Agreement noncompete is unenforceable in Colorado.

TBM is moving for a preliminary injunction under the Franchise Agreement. The Franchise agreement is superseded by the Settlement Agreement, and the only parts of the Franchise Agreement which still have affect are those permitted by the Settlement Agreement. Settlement Agreement § 2 attached at Compl., Ex. 14. So, TBM first must prove fraud to rescind the Settlement Agreement and reimpose the Franchise Agreement because the Settlement Agreement has "narrower restrictions." Mtn. p. 23. What is more, even if the Franchise Agreement was reinstated, TBM's claims would fail because the Franchise Agreement noncompete provision is overbroad and unenforceable in Colorado.

### 1.  TBM cannot enforce Franchise Agreement terms that have been modified by the Settlement Agreement.

While the Settlement Agreement provides for the survival of portions of the Franchise Agreement, TBM asks the Court to enforce terms superseded by the Settlement Agreement. "Parties may use a merger or integration clause to "substitute an entirely new contract for a previous one, particularly where the modified or new contract is in writing and is valid in all other respects." In re Est. of Gadash, 413 P.3d 272, 278 (Colo.App. 2017) (quoting *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 661 (10th Cir.2006)) (citing *In re Marriage of Young*, 682 P.2d 1233, 1236 (Colo.App.1984)). A "binding integrated agreement discharges" inconsistent prior agreements. *Id*. (quoting Restatement (Second) of Contracts § 215 cmt. a (Am. Law Inst. 1981)). Terms in the Franchise Agreement that have been modified by the Settlement Agreement no longer have effect. Settlement Agreement § 2 attached at Compl., Ex. 14 ("Renewal Franchise Agreement…shall continue unless modified herein."). For example, TBM seeks to enforce the noncompete in section 16.D of the Renewal Franchise Agreement, even though it is expressly modified by Settlement Agreement § 3. TBM also is attempting to apply 18.C., 18.F., and 18.G. providing for attorney fees and arbitration, even though those clauses are superseded by Settlement Agreement §§ 7(b), 7(e). Section 11 of the Franchise Agreement is superseded to the extent it deals with client lists by Settlement Agreement § 4. After agreeing on terms in principle, Defendants spent over two weeks working with TBM to agree on precise language and remedies for a mutually agreeable settlement. Without establishing fraud and obtaining rescission, TBM must apply the Settlement Agreement terms.

### 2.  Even if the Franchise Agreement applied in whole, TBM's claims would fail because its noncompete provision is overbroad and unenforceable in Colorado.

Most noncompetition agreements in Colorado are void. Colo. Rev. Stat. Ann. § 8-2-113. Colorado not only views noncompetition agreements as contrary to the statutory law but

also as violative of public policy. *23 LTD v. Herman*, 2019 COA 113, ¶ 20, 457 P.3d 754,

758, *cert. denied sub nom. 23 Ltd. v. Herman*, No. 19SC632, 2020 WL 624253 (Colo. Feb.

10, 2020). The statute identifies four limited exceptions and even in those circumstances the

scope must be narrowly tailored. *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App.

2011). Noncompetition agreements must be valid when signed, those failing to comply with

Colorado's public policy and statutory restrictions are "void ab initio." *Phoenix Cap., Inc. v.

Dowell*, 176 P.3d 835, 840 (Colo. App. 2007). Colo. Rev. Stat. Ann. § 8-2-113.

TBM argues that the statute's trade secret exception (CRS § 8-2-113 (2)(b)) applies to

this noncompete. It does not. A noncompetition clause designed to protect trade secrets, as

argued here, must be narrowly drafted to fit into the statutory exception. *Gold Messenger,

Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997). Where a separate section of the

contract protects trade secrets, a blanket noncompetition clause will not be read to protect

trade secrets and is void. *Colorado Acct. Machines, Inc. v. Mergenthaler*, 609 P.2d 1125,

1126 (Colo. App. 1980); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 527–28 (Colo. App.

2011).

The Franchise Agreement here contains a blanket noncompetition agreement in

Section 16.D. while confidential information and trade secrets are protected through Sections

16.C. and 11. Because the Franchise Agreement separates the confidentiality/trade secret

clauses and the covenant not to compete does not expressly reference trade secrets, as a

matter of law, the trade secret exception cannot apply to allow the noncompete provision

under CRS §8-2-113(2)(b).

Assuming *arguendo* that the trade secret exception could apply, then the covenant not

to compete would have to be reasonably limited to the protection of those secrets. The *Gold

Messenger* case, 937 P.2d 907 (Colo. App. 1997) is illustrative. *Gold Messenger* involved an

advertising circular franchise, and a noncompete forbidding the franchisee from creating and

17

distributing its' own advertising circular within the same territory. It was narrowly tailored to advertising circulars. TBM, on the other hand, offers "barre-based exercise classes, using proprietary and non-proprietary instructional techniques." *See* Franchise Agreement at § 1.A, Compl. Ex. 1. Yet, its noncompete excludes franchisees from any gymnasium, athletic or fitness center, health club, exercise or aerobics studio or any other similar facility or business offering "barre-based or other fitness-based instruction." *Id.* at *12. And, as TBM points out, they rejected Henderson's offer to continue the franchise because Henderson wanted to offer "wellness" services at the location. The prohibition here is not narrowly tailored to the protection of any trade secrets because it excludes services TBM doesn't offer and has no trade secrets in.

TBM stretches inapplicable cases to fit these circumstances to try and avoid Colorado's statute prohibiting noncompetes. For instance, TBM relies on *Miller v. Kendall*, 541 P.2d 126, 127 (Colo. App. 1975), for the proposition that a breach justifies an injunction as a matter of course. However, Colorado's noncompete statute was passed after the *Miller* decision and has abrogated the holding cited in *Miller*. CRS § 8-2-113. TBM likewise cites to an outdated version of the Colorado Practice Series to contend that the noncompete statute does not apply to agreements between businesses—such as a franchisor and a franchisee (if an entity). *See* Mtn. p. 32. This is a misstatement of Colorado law relying on an expired and out of print version of the Colorado Practice Series. The current version does not contain any such statement, indeed it cannot because the noncompetition statute applies to relationships between businesses and franchisees and franchisors. *Nutting v. RAM Sw., Inc.*, 106 F. Supp. 2d 1121 (D. Colo. 2000) (voiding the overly broad noncompetition agreement between two manufactures of vampire fangs); *Gold Messenger*, 937 P.2d 907 (Colo. App. 1997).

Likewise, TBM promotes cases where Franchisees have terminated agreements early; however, where Franchise Agreements have expired according to their terms courts have

routinely denied injunctions, and allowed former franchisees to continue in the same industry

and location. *See Big O Tires, LLC v. Felix Bros.*, 724 F. Supp. 2d 1107 (D. Colo. 2010). The

Franchisor in *Big O Tires*, like TBM, pointed to *Quizno's Corp. v. Kampendahl*, No. 01 C

6433, 2002 WL 1012997 (N.D.Ill. May 20, 2002), to support its claims of a threat to the

franchise system. *Id.* But the court distinguished cases like *Quiznos* by stating, "Those cases,

however, involved post-termination covenants not to compete in situations where the

franchise agreements were terminated early." *Id.*

Similarly, TBM cites *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No.

120CV02757DDDSTV, 2020 WL 6119470, (D. Colo. Oct. 16, 2020), another case involving

parties signing an early termination agreement as to three Franchise Agreements. *Id.* at *2.  In

*Fitness Together,* pursuant to the termination agreement, the franchisee agreed, in exchange

for $48,000, to discontinue operations at her three gyms and to direct her clients to other

Fitness Together gyms. *Id.* After doing so, instead of fulfilling her promises, the franchisee

reorganized under a different LLC and operated in the same locations. *Id.* More importantly,

in that case, the franchisee defendant did not make any substantive arguments regarding

application of the noncompete or any other issue on the merits, and instead simply argued

jurisdiction.  *See Id.* at *9 ("Defendants have not disputed any of these claims on the merits,

and instead opted solely for a jurisdictional defense that has failed.")  The Court carefully

points this out and emphasized it accepted all facts and arguments by the plaintiff seeking to

enforce the noncompete as true. Due to the vastly different facts and lack of an adversarial

contest in Court, this unpublished federal decision is not a trustworthy recitation of

Colorado's noncompete jurisprudence.

    **C.  TBM's trade secrets claims are likely to fail because TBM has
not established any trade secrets nor has it shown
misappropriation by Defendants.**

To prevail on its trade secrets claim TBM must show that it is the (1) owner of (2) a trade secret that has been (3) misappropriated. 18 USC § 1836. An Owner is person or entity with license or rightful legal or equitable title in a trade secret. 18 USC § 1839. Colorado adopted the Colorado Uniform Trade Secrets Act (CUTSA) in 1986. To the extent TBM cites prior cases interpreting Colorado trade secret law this Court must view those authorities cautiously. Whether a process, product, or customer list is a trade secret is a question of fact for a jury or the trial court. *Colorado Supply Co. Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990). A contractual statement that something is a trade secret is not controlling, instead an independent determination based on the facts must determine whether a trade secret exists. *King v. PA Consulting Group, Inc.*, 485 F.3d 577 (10th Cir. 2007). Businesses wishing to claim a protectable trade secret in Colorado must take steps beyond general precautions most businesses take to keep information confidential. 16 COLORADO PRACTICE SERIES § 7:14 (3d. ed 2021). The following six factor test is to be used to determine whether information is a trade secret:

1. the extent to which the information is known outside the business;
2. the extent to which the information is known to those inside the business (i.e., by the employees);
3. the precautions taken by the holder of the trade secret to guard the secrecy of the information;
4. the savings effected and the value for the holder in having the information compared with competitors;
5. the amount of effort or money expended in obtaining and developing the information; and
6. the amount of time and expense it would take for others to acquire and duplicate the information.

*Colorado Supply Co. Inc.*, 797 P.2d at 1306.

**1. TBM has not established under Colorado law that its client lists are a trade secret.**

Customer identities are typically not a trade secret. And, if a customer list is made up of information that competitors can readily obtain from other sources, such as trade publications, a phone book, public Facebook or other social media membership, or any other public or trade source, a customer list is not a protectable trade secret. *Colorado Supply Co.*

*Inc.*, 797 P.2d at 1306 (holding that a customer list was not a trade secret because the list and associated information could be obtained by reviewing the business section of the telephone directory). The fact that TBM allows and encourages the use of Facebook groups and other social media to reach clients and publicly connect them to its brand means that it cannot treat their identities as a trade secret in Colorado or prevent them from being contacted through such social media. Moreover, these clients have personal relationships with Ms. Henderson and her instructors so their contact information and identities are not trade secrets to the extent those people know them.

### 2.  TBM's Client List has not been misappropriated.

Misappropriation means "disclosure or use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C.A. § 1839 (5)(B)(ii)(II). No defendant has used TBM's client list, nor do they have access to it. The Franchise Agreement expired on November 30, 2021. As a result, Defendants cannot access and do not possess information belonging to TBM that is kept secret and inaccessible to the public at large.

At the termination of the Franchise Agreement and prior to the December 2nd execution of the Settlement Agreement, Defendants contacted TBM to revoke its access to the TBM client list via MindBody, the third-party site TBM uses to hold such information. So, Defendants have not had access to any customer lists since the Settlement Agreement was executed. Even prior to that date, TBM has not shown any use of TBM client lists by Defendants. In fact, the only communication sent to all clients of the now expired studio that referenced Ms. Henderson starting Bravence and that clients could follow her there was sent by Sarah Stabio the owner of TBM's last remaining studio in Colorado which is located in

Stapleton. Importantly, that Stapleton studio is more than five miles away from 311 Steele Street, Bravence's current temporary location, or Bravence's ultimate home.

TBM does not cite any evidence of misappropriation of its client lists, and instead urges the Court to infer a trade secret violation from the fact that many clients of Ms. Henderson and the now expired studio in Cherry Creek are customers of Defendants. But that does not establish a misuse of any client list.

### 3.  Outside of customer lists, TBM has not identified any trade secrets beyond broad conclusory claims.

TBM alleges violation of trade secrets for classes "exactly like" TBM's use of the word "Barre" "proprietary instruction, verbal adjustment cues, and choreography following the exact same sequence as of a TBM class." Mtn. p. 16. Defendants deny that Bravence's classes are exactly the same as TBM. More to the point for trade secret analysis, TBM fails to show ownership of these elements. TBM fails to point to any Patent, Copyright, Trademark, or other property right showing license or title in any trade secret. Instead, TBM claims proprietary instruction cues and choreography, training and certification, marketing techniques, and customer retention strategies but does not identify what these are or ownership of them.  Furthermore, none of them are secrets. In fact, they are known industry-wide and available to anyone in the general public who takes a TBM class or watches one online for free, or who is a consumer marketed to in America. Even the certification and training TBM claims is secret is posted online for free and has been for the past five years so that potential instructors could prepare for certification – its simply not secret.

"The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp*., 416 U.S. 470, 475, 94 S. Ct. 1879, 1883, 40 L. Ed. 2d 315 (1974). Novelty is required. *Id*. at 1884. TBM must do more than describe the subject matter of the trade secrets in a vague and conclusory manner." *Sticky.io, Inc. v. Martingale Software*, LLC, No. 21-CV-00664-RM-

STV, 2021 WL 5508429, at *4 (D. Colo. Oct. 27, 2021), report and recommendation adopted, No. 21-CV-00664-RM-STV, 2021 WL 5759286 (D. Colo. Dec. 3, 2021).

TBM operates in a sector where many other businesses provide classes similar to its own offerings. To determine if a trade secret exists courts look to the "extent to which the information is known outside the business" because a trade secret must be secret, and not public knowledge or of a general knowledge in the trade or business." *Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 2016 COA 176M, ¶ 20, 411 P.3d 1126, 1130, as modified on denial of reh'g (Jan. 12, 2017) (Finding an oil drill bit was not a trade secret because other drilling firms used similar designs.) The court in *Hawg Tools*, ruling under CUTSA, found that party claiming a trade secret did not do enough to distinguish its product from the rest of the industry. Similarly, TBM must show that its methods are different enough from the competition to qualify as a trade secret.

Additionally, a business does not own and cannot protect as trade secrets the skills, ability, or experience that a worker brings to a job or acquires while performing a job and so it cannot stop an individual from making a living through those skills. *Mulei v. Jet Courier Service, Inc.*, 739 P.2d 889, 892 (Colo. App. 1987), *judm't rev'd on other grounds* 771 P. 2d 486. General business procedures, likewise, cannot be established as trade secrets unless the company seeking to protect them proves they are unique and secret. *I Can't Believe It's Yogurt v. Gunn*, 1997 WL 599391 (D. Colo. 1997). Put simply, the skills Ms. Henderson developed operating a fitness studio cannot be claimed as a trade secret to prevent her from earning a living in Colorado under a noncompete.

Here, TBM argues that its client identities and its training, exercise techniques, marketing techniques, and vendor relationships are all protectible trade secrets that justify an injunction. There are two problems with this. First, TBM never shows, beyond broad conclusory claims, that any trade secrets exist in any of these categories. Put otherwise, TBM

must show specifically what these trade secrets entail. An exercise technique, standing alone, is not a trade secret. There are 6 barre studios in Cherry Creek alone—barre is not a trade secret. You cannot copyright the practice of yoga or protect swimming instruction as a trade secret. *Bikram's Yoga Coll. Of India, L.P. v. Evolation Yoga, LLC*, 803 F. 3d 1032, 1040–41 (9th Cir. 2015); *Shidler,* 143 F. Supp. 2d 1247 (D. Colo. 2001). That is especially true because clients served are taught the techniques every time they visit a fitness studio—and TBM does not make them sign a confidentiality agreement to protect its techniques. *Shidler,* 143 F. Supp. 2d at 1252. Second, assuming some trade secret exists, TBM cannot show Ms. Henderson has used or divulged any trade secret information for Bravence Wellness Collective.

### D.  TBM fails to show it will suffer irreparable harm without an injunction.

Irreparable harm must be both certain and great," id.; and that it must not be "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). Cases have also noted that irreparable harm is often suffered when "the injury can[not] be adequately atoned for in money," id.; or when "the district court cannot remedy [the injury] following a final determination on the merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

Here, Defendants are in compliance with a validly negotiated settlement agreement. It TBM suffers no harm by following the Settlement Agreement it negotiated through the counsel of its choosing. Furthermore, that Settlement Agreement provides for liquidated damages in the event either side violates the client information provision. Settlement Agreement 4 attached at Compl., Ex. 14.

### 1.  The factors to be considered disfavor an irreparable harm finding.

Assuming *arguendo*, a finding of violation of the Settlement Agreement, irreparable harm is not automatic. A permanent injunction will only be given when there is (1) an

inability to calculate damages; (2) harm to goodwill; (3) diminishment of TBM's competitive position in the market. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004).

A franchisee can show irreparable harm by plausibly showing that it will go out of business pending trial. *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1249 (D. Colo. 2007) (finding irreparable injury to the franchisees where "there is ample evidence in the record regarding the likelihood that the immediate terminations ordered by [franchisors] would effectively close [franchisees] stores completely pending trial[.]"). Here, Bravence's operation of a separate, independent business (that is not even competitive with TBM), upon the upcoming expiration of the Franchise Agreement, will be Henderson's sole livelihood. (*See* Henderson Aff. at ¶ 5.) The balance of harms, thus, tips in Defendants' favor because, if this Court were to grant the temporary injunction, Bravence would be forced to close its doors completely pending trial. Defendants will be greatly burdened if forced to not be in business altogether during the pendency of this case. Defendants have invested heavily in this endeavor. (*See* Henderson Aff. at ¶ 5.) Even if TBM's business opportunities would be harmed, plainly, TBM will not be forced to shut down all operations on a nationwide basis. TBM has over 84 locations (according to its recent FDD as amended August 2, 2021), including one location roughly six miles from Bravence. *See Mainstream Fashions*, 453 F. Supp. 3d at 1205 (finding similar facts sufficient to warrant a denial of the Franchisor's requested injunctive relief). Defendants' livelihood and small business far outweigh TBM's (a large corporation) supposed harm of facing ordinary competition from a single fitness studio miles from TBM's sole studio in Colorado. *See also Mainstream Fashions*, 453 F. Supp. 3d at 12-5 (finding that balance tipped against issuance of injunction because the "forced shutdown of [franchisee's] business is itself an irreparable harm, particularly where the business constitutes the sole livelihood of an owner."); *Ryko Mfg. Co. v. Eden Servs.*, 759

25

F.2d 671, 673 (8th Cir. 1985) (affirming district court's finding that the manufacturer "could be compensated by money damages for any losses is suffered whereas money damages could not fully compensate [distributor] for the loss of its business.").

Moreover, Defendants would be immeasurably harmed if forced to be prohibited from operating a separate, independent, noncompetitive business consistent with Colorado law. Stated differently, if the Court were to grant the requested injunction, the Court would impose upon Defendants a burden that is inconsistent with Defendants' rights under Colorado law, and thus self-inflicted. The caselaw that TBM cites for the self-inflicted harm argument is unpersuasive and distinguishable for this reason alone. *See also, e.g.*, *Mainstream Fashions*, 453 F. Supp. 3d at 1204 (pointing out franchisor's problematic argument that any harm to franchisee is self-inflicted because "to label a defendant's harm 'self-inflicted' necessarily presumes—on an undeveloped record at stage in the case where the chances for mistake are substantial—that the defendant will go on to lose the case" and assuming so on an a "sparse record is an unfounded presumption about the merits of the case."). *See also id.* at 1205 (citing *Anytime Fitness* caselaw and stating that "in the context of a dispute over franchise agreement noncompete provisions and contract obligations . . . [t]here is a strong public interest in upholding contractual agreements[,] [while] there is also a public interest in unrestrained competition.") (internal quotations and citations omitted).

### (a) TBM can calculate its damages, and has done so already.

TBM must show an inability to calculate damages. Simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Here TBM can calculate their damages, in fact they have already done so. First, the Settlement Agreement contains a liquidated damages clause regarding customer lists. Second, TBM has already filed an arbitration, in violation of the Settlement Agreement, seeking damages.

"…The Bar Method is contemporaneously filing a Demand for Arbitration…in pursuit of its claims for monetary damages against Defendants." Mtn. p. 10 fn1. If TBM can calculate damages for Arbitration on these same facts they can do so here.

### (b)  TBM Fails to Show harm to its goodwill, or that its marketplace position will diminish.

Whether the court grants or denies a preliminary injunction, TBM will not have a location in Cherry Creek. TBM will not have any customers in Cherry Creek. TBM has been aware for years that Defendant Henderhiser, LLC would not be able to continue in the 311 Steele Building after the expiring of the lease, because the building was purchased during the lease by a hospital that wanted to convert it another use. TBM declined any new locations in Cherry Creek and has opted not to open another franchise there even knowing Defendants' franchise would expire and disappear.

### (c)  An injunction will harm Defendants more seriously than any injury to TBM.

On the other hand, entry of an injunction will irreparably harm Defendants. Defendants are starting their sole business and have invested significant resources to do so. An injunction will cost Defendants their client relationships, and likely force the breach of multiple business commitments. All in a competitive market that TBM has abandoned.

### (d)  An injunction will adversely affect the public interest.

TBM must show that "the injunction, if issued, will not adversely affect the public interest." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). They cannot do so. With an injunction, Defendants will have to fire their employees; cancel or default on their outstanding obligations; and their customers will lose their preferred fitness opportunities. Defendants' landlord and vendors working with Defendants will lose contracts and income.

### D. A substantial bond would be necessary if the Court determined to issue a Preliminary Injunction.

27

Rule 65(c) provides that "[t]he Court may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages of any party found to be wrongfully enjoined or restrained." TBM argues that no bond is needed despite that they are seeking to have a currently operating business and Ms. Henderson's sole source of income shut down and costing Bravence its relationships with teachers, clients, and businesses, while it continues to pay rent and other monthly obligations or is forced to default on such obligations. Moreover, due to the attorneys fee clause in the Settlement Agreement TBM would owe attorneys fees to Defendants. Based on the multiple venues in which TBM has filed and the volume of its pleadings, undersigned anticipates that those attorneys fees could be substantial. TBM's suggestion that no bond is required implies that they do not believe that Bravence's business and client base is valuable enough to be worth any amount of money, which contradicts their claims of irreparable harm threatened to TBM. In an injunction is issued, a bond is required.  Bravence estimates that a wrongful preliminary injunction resolved one year from today would cost it $1,000,000 in lost revenue, $300,000 in costs to restart the business and redevelop its good will and customers, and $500,000 in recoverable attorneys fees. Meaning a bond of $1,800,000 would be required of TBM. Bravence recognizes that all such costs are rough estimates, and delays in litigation or other changed circumstances could substantially impact those estimates in either direction. However, the purpose of the statute is to protect a wrongfully enjoined party and so any error in the estimate should be to a greater amount.

### E.  Defendants should be awarded attorneys fees.

Consistent with the arguments in TBM's own attorney fee request, Bravence requests attorneys fees pursuant to Settlement Agreement § 7(e) upon denial of TBM's Motion for Preliminary Injunction. Mtn. Ex. A-2.

### IV.  CONCLUSION

TBM wishes to rescind a valid settlement agreement negotiated by counsel. Rescinding the agreement would require the court to look beyond the four corners of the document and at communications covered by ROE 408 and attorney client privilege. The reality TBM entered into the Agreement and should have to abide by it even if they no longer think it is advantageous. The Settlement controls this suit, and so TBM's claims for Breach of the Franchise Agreement fail. Finally, TBMs trade secrets claims fail. TBM cannot show that it is likely to be successful on the merits.

Likewise, TBM cannot show irreparable harm. There is no status quo ante that puts a TBM studio back at 311 Steele Street in Cherry Creek. TBM chose in May of 2021 not to continue a franchise in Cherry Creek, nothing has prevented them from opening a new franchise, but they have chosen not to do so.

The harm to Defendants on the other hand is great. It effects obligations to creditors, landlords, employees, and the public. An injunction will harm all of these groups and provide nothing back to the community, because no TBM Studio will exist.

DATED: January 3, 2022.

SCHROEDER LAW LLC

*s/ Edward T. Schroeder*
Edward T. Schroeder
Schroeder Law, LLC
2 West Dry Creek Circle
Suite 240
Littleton, Colorado 80120
Phone: 720.399.0123
Email: ed@schroeders.law
*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of January, 2022, a true and correct copy of this Response to Motion for Preliminary Injunction was served via CM/ECF to the following counsel:

> Susan E. Tegt, Esq.
> Larkin Hoffman Daly & Lindgren Ltd.
> 8300 Norman Center Drive
> Suite 1000
> Minneapolis, Minnesota 55437-1060
> (952) 835-3800
> stegt@larkinhoffman.com
>
> AND
>
> Kelley B. Duke,
> Ireland Stapleton Pryor & Pascoe, PC
> 717 17th Street, Suite 2800
> Denver, Colorado 80202
> (303) 623-2700
> *kduke@irelandstapleton.com*
>
> *Attorneys for Plaintiff*

                                        *s/ Edward Schroeder*
                                        Edward Schroeder